SOL FINKELMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Finkelman v. Commissioner
Docket Nos. 7581-86, 34999-86.[1]
United States Tax Court
T.C. Memo 1989-72; 1989 Tax Ct. Memo LEXIS 72; 56 T.C.M. (CCH) 1269; T.C.M. (RIA) 89072; February 16, 1989. Marvin J. Garbis and L. Paige Marvel, for the petitioner. Mary Schewatz, Steve *74 Mather and Thomas Coker, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in statutory notices of deficiency as identified below, determined deficiencies and additions to petitioner's income taxes as follows: Notice of
Income Tax
Additions to Tax
Deficiency
Year
Deficiency
Sec. 6651(a)(1) [2]
Sec. 6653(a)
Sec. 6659
1/30/86
1975
$   9,035
$  1,980
$    507
$  --   1/30/86
1976
70,535
17,634
3,587
--   --
1977
120,787
30,093
6,177
--   --
1978
315,368
--  15,768
--   6/16/86
1979
96,156
20,878
4,808
--   6/16/86
1980
129,051
23,281
6,453
--   --
1981
243,919
--  * 12,196
33,603
--
1982
91,571
--  * 4,579
23,078
After concessions, the issues remaining *75 for our consideration involve petitioner's real estate investment activity. The specific issues to be considered are: (1) Whether petitioner should be allowed claimed losses related to certain real estate transactions; (2) whether petitioner should recognize gross income attributable to partnership interests received for services; (3) whether the section 6653(a) addition to tax applies to any underpayments; (4) whether petitioner is liable for additions to tax pursuant to section 6659; and (5) whether petitioner is liable for increased interest on tax motivated transactions under section 6621(c). FINDINGS OF FACT This is a "lead" case of a related group of taxpayers who invested in and claimed tax benefits regarding certain real estate partnerships formed and managed by petitioner, Sol Finkelman. Respondent determined adjustments with respect to 17 of the partnerships. Adjustments involving eight of the partnerships are still at issue, and these will be resolved, by agreement of the parties, on the basis of findings regarding these five "test" cases or properties. The properties selected by the parties are representative and are intended to obviate the need for further litigation *76 concerning each property owned by the eight partnerships. The five "test" partnerships and properties are as follows: Name and Address of Property
Partnership Name
Bank of Florida Building
Seaside Properties Co.
2350 34th St. North
St. Petersburg, Florida
Duluth Post Office
Duluth Properties Co.
2800 W. Michigan St.
Duluth, Minnesota
Hacienda Bank Building
Oxnard Properties Co.
11900 Brookhurst St.
Garden Grove, California
First Valley Bank Building
Bethlehem Properties Co.
One Bethlehem Plaza
Bethlehem, Pennsylvania
Progressive Savings and Loan Building
Progressive Properties Co.
12175 Ventura Blvd.
Studio City, California
Petitioner, Sol Finkelman, resided in California when the petition was filed in this case. His tax return for 1975 was filed jointly with his "then" wife, Helen. His tax returns for the years 1976 to 1982 were filed jointly with his "then" wife, Luisa. The stipulated facts and exhibits are incorporated herein by this reference. Petitioner was born in Warsaw, Poland, in 1918 and immigrated to the United States in 1923. During military service in the United States Army, petitioner was responsible for various financial *77 and accounting functions. In 1947, petitioner received his Bachelor's degree in Business Administration with a specialization in accounting from the City College of New York. In 1949, he became a certified public accountant in the State of New York and, in 1951, was certified in California. After graduating from college, he worked as an accountant, initially in New York and then in California. In June 1956, petitioner opened his own office, representing clients in financial and business matters, including real estate transactions, estate planning, pension matters, investment planning, accounting and tax matters. He has engaged in investment counseling as part of his accounting practice since 1948. Petitioner typically proposed investments in real estate to his clients. Commercial property under a long-term lease to a single tenant was normally recommended. During the years 1947 to 1970, petitioner, on numerous occasions, advised clients concerning specific real estate transactions. Background -- Penner Transactions
Sometime in 1969, petitioner began to look for and buy commercial real estate for his own account and for clients who were interested in real estate investment. *78 During 1969, petitioner, on behalf of several of his clients, purchased two post offices from Selden Ring (Ring), a real estate developer. Several months later, petitioner contacted Ring about the purchase of additional commercial properties and was referred to Ring's partner, Joseph Penner (Penner). Penner, a real estate builder and developer, had engaged in real estate investment since 1962. His activities included the construction, development, acquisition, management and sale of real estate throughout the United States. Penner purchased and/or constructed numerous post office buildings for the United States Government. Penner also built and owned commercial buildings leased to single "major credit" tenants. Penner's business, up until 1970, involved the occasional sale of real properties. Beginning approximately in 1970, the Penner Ring Co. (a partnership in which Penner was involved) and thereafter Penner individually, began to sell [3] real estate to partnerships formed by petitioner, or to petitioner on behalf of partnerships. From 1970 to 1982, petitioner or said partnerships purchased approximately 50 properties from Penner. The first two properties (post offices *79 located in California and Montana) were acquired in 1970 by the Orange/Wolf Point Properties partnership. The vast majority of the properties Penner sold were to petitioner or to entities controlled by petitioner. From 1970 to 1975, the properties purchased were all post offices. In 1975, petitioner purchased ten properties from Penner, one of which was the Pacific Telephone Building in Concord, California. This was the first "Penner property" that was not a post office. After 1975, petitioner shifted focus from post offices to commercial buildings with long-term net or master leases. This was done because the maintenance costs and obligations of a lessor under a standard post office lease had increased considerably as a result of inflation and other factors, and Penner was reluctant to enter into the kind of maintenance contracts for future post office deals that had been negotiated in prior transactions. [4] During the period at issue, rents for the type of properties petitioner acquired could be expected to rise between three *80 and four percent annually. Generally, negotiations for the purchase and sale of properties owned by Penner to petitioner or the partnerships would commence late in the year preceding the year of sale or early in the year of sale. At the beginning of the negotiation process, information would normally be furnished by Penner to petitioner. The information concerned the land, improvements, tenant, applicable lease terms including the rental, underlying indebtedness, and Penner's desired purchase terms. The purchase terms included the amount of the down payment, amount of any balloon payments, and the length of the payout period. After the initial exchange of information and terms, Penner and petitioner would negotiate the final terms of sale. The negotiations would focus on price, interest rate, seller financing, down payment, financing period and amount of balloon payments. In some of the transactions, instead of a purchase of the fee, the improvements were purchased and a *81 ground lease was executed. In such transactions, the improvements would revert to Penner at the end of the ground lease. In two out of three instances, for the test properties, there was some documentation indicating that the partnerships had the option to purchase the underlying property at or near the termination of the ground lease. This documentation included an option agreement with "November    , 1980" as the date (Progressive) and a letter written 3 years after the date of sale (Bank of Florida). Penner would typically ask for a price based on an all cash deal. Petitioner would then submit a "below-market financing proposal" back to Penner with an increased purchase price. The down payment, in a typical real estate transaction between Penner and Finkelman (or a partnership), [5] was paid out over 2 or 3 calendar years. The transaction was structured so that after the down payment was fully paid, the cash flow from the rental payments under the existing lease on the property would be paid by the tenant either to an independent corporate trustee or to Penner directly. It was credited to the unpaid interest and principal on the promissory notes, as well as to any ground *82 rents due Penner on properties where the partnership had only a ground lease. Ten to fifteen years after the purchase agreement was executed, a substantial balloon payment, equal to two to four times the original down payments, would be due to Penner. The balance remaining after the balloon payments was due usually at or about the time the initial term of the underlying lease ended. The interest on the unpaid balance of the purchase price was structured in two tiers -- it would run for an initial fixed term (usually the first 36 months) at or slightly below market rates and for the remaining period at rates significantly below market. Once the terms were agreed to, the necessary documentation was prepared for review and execution by Penner's attorney in California. The documentation typically included an agreement of sale, one or more promissory notes, deeds of trust or mortgages, assignment of lease, collateral assignment of lease, financing statements, ancillary letter agreements, and deed. The documents were typically *83 executed at the end of the year or later, but were made effective many months earlier. From 1977 through 1981, partnerships formed by petitioner purchased properties from Penner. The partner-investors were primarily petitioner's clients or former clients or people referred to petitioner by other professionals. Petitioner characterized the partnerships as "Tax Oriented Ventures." In most cases, the partnership formed to purchase the property would be a party to the documentation confirming the particular purchase. In 1979, however, the documentation appears in petitioner's name only. When a property was offered for sale to petitioner, he would review the data available and determine if he or one of his partnerships was interested in purchasing the property. Petitioner declined to purchase at least 22 properties offered for sale by Penner. Petitioner did not necessarily inspect the properties that he purchased. One of the properties involved in this case, the Duluth Post Office, was turned down twice before petitioner agreed to purchase it. In certain transactions, including the First Valley Bank and Progressive Savings and Loan transactions, Penner retained a right to refinance *84 the underlying indebtedness subject to certain limitations, terms and restrictions. If the underlying financing was obtained when interest rates were relatively high, Penner required the ability to refinance on more favorable terms when economic conditions changed. Of approximately 50 properties purchased from Penner between 1978 and 1981, only three of the properties have had balloon payments come due or have been sold. Of these three properties, one was sold before the balloon payment due date; one had the balloon payment come due and it was paid; and the third had the balloon payment come due and it was not paid. Penner and his associates were not partners in any of petitioner's partnerships. Petitioner was not aware of the manner by which Penner treated the transactions for income tax purposes. Petitioner received a partnership interest in each real estate partnership formed by him in exchange for his services. This interest consisted of a percentage of profits and losses, as well as a capital interest subject only to the right of other partners to first recover their cash contributions. Duluth Post Office
In 1977, Duluth Properties Co., a California partnership, *85 purchased an undivided one-half interest in a fee estate located in Duluth, Minnesota, from Solar Properties Co. The property consists of land and improvements which, at the time of purchase, were leased to the United States Postal Service for use as the United States Post Office facility at 2800 West Michigan Street in Duluth, Minnesota. Duluth is a major inland port for Great Lakes shipping. Located adjacent to Duluth is the city of Superior, Wisconsin. The Duluth Post Office is centrally located in the Duluth-Superior area near the intersection of major highways. Access ramps connecting the area to Interstate 35 are at 27th Avenue West, less than one block from the subject property. The Duluth Post Office consists of a main building, a vehicle maintenance facility and miscellaneous improvements. The improvements, constructed in 1969, were in very good condition and were used for the Duluth main post office and for the Management Sectional Center, an operating hub for administrative and carrier functions. The subject property is zoned for a wide range of commercial and industrial uses. By deed dated July 19, 1968, the United States conveyed the land to Penner-Ring Co. *86 , a partnership consisting of Joseph Penner, Selden Ring and Ellis Ring. The conveyance was subject to the condition that the partnership construct a postal facility on the property and thereafter lease the facility back to the United States. The Penner-Ring partnership caused the construction of the improvements in 1969 and 1970. The initial term of the lease between Penner-Ring Co. and the United States (lease) is from March 1, 1970 to February 28, 2000, a period of 30 years. The annual rent during the initial term of the lease is $ 218,400 payable $ 18,200 per month at the end of each month. The lessee is granted eight consecutive 5-year renewal options with annual rental during the renewal period totaling $ 225,000 per year. The lease is a net lease, with the lessee assuming obligations for utilities, taxes and some (but not all) repairs and maintenance on the leasehold. Under the terms of the lease, the lessee is granted options to purchase the Duluth Post Office property at the end of the initial 30-year term and at the end of each of the first four renewal periods at a price of $ 4,400,000, and at the end of the second four renewal periods at a price of $ 4,200,000. *87 In 1971, Joseph Penner and Selden and Ellis Ring became tenants in common by agreement dated June 14, 1971, with Penner acquiring a 50-percent interest and the Rings acquiring a 50-percent interest. By Agreement of Sale dated December 21, 1977, Joseph and Grace Penner (Penners) agreed to sell all their right, title and interest in and to the Duluth Post Office property and the Tenancy in Common Agreement (TIC Agreement), and to assign all their rights and obligations in the lease to Solar Properties Co. (Solar), a limited partnership owned by petitioner and his son, Lawrence. The purchase price for the 50-percent interest was $ 1,548,231, payable as follows: (1) a cash payment of $ 86,667 at closing; (2) a nonrecourse promissory note (Purchase Note) for $ 228,827; and (3) acquisition of the property subject to the existing senior indebtedness [6] (Senior Note), 50 percent of which equaled $ 1,232,737.14. By letter dated December 21, 1977, the terms of the sale agreement were modified to permit the initial cash payment to be made in two parts -- $ 73,000 in December 1977 and $ 13,677 on January 5, 1978. *88 The Penners' undivided one-half interest in the Duluth Post Office property was conveyed to Solar by warranty deed dated December 21, 1977. In addition, an Assignment of Lease and Acceptance of Assignment, as well as an Assignment of the TIC agreement, were executed by the parties and along with the deed were duly recorded in the land records. The Purchase Note was in the principal amount of $ 228,827 and bore interest at the rate of 10 percent from April 1, 1977. A principal payment of $ 173,333, guaranteed by petitioner, was due March 31, 1978, and the remaining principal and interest was due on February 28, 2000. The Purchase Note was secured by a Purchase Mortgage, a Collateral Assignment of Lease, and by a Financing Statement on the fixtures and personal property, each of which was duly recorded in the land records. The Postmaster General was notified of the transfer of one-half of the property ownership to Solar. Solar entered into a contract with Duluth Properties Co. (Duluth), a California limited partnership, to sell the one-half interest it had just acquired in the Duluth Post Office property. The Agreement of Sale was dated December 22, 1977. Solar was used as *89 an intermediary in this transfer from the Penners to Duluth because of the potential adverse tax consequences to the Penners from a direct transfer. The conveyance from Solar to Duluth was authorized in writing by the Penners, who agreed that the conveyance would not accelerate the principal and interest on the Purchase Note. The purchase price in the Duluth-Solar transaction was $ 2,301,000, payable as follows: (1) $ 85,000 cash at closing; (2) a wraparound nonrecourse promissory note in the amount of $ 2,301,000. [7] Under the terms of the agreement, an additional payment in the amount of $ 175,000 was due on March 31, 1978. These terms were the same as those in the original proposed direct sale between Penner and Duluth. Under the terms of the wraparound promissory note, Duluth promised to pay Solar $ 2,301,000 on or before July 31, 2004, with interest at the rate of 10 percent per annum for the first 36 months and 5 percent per annum thereafter. The promissory note was secured by a mortgage dated December 23, 1977, which was duly recorded. *90 The conveyance was accomplished by a warranty deed dated December 23, 1977. The parties also executed an Assignment of Lease, an Assignment of the TIC Agreement, a Collateral Assignment of Lease, a Security Agreement, and a Financing Statement. In addition, in the Maintenance Agreement, Solar assumed the administrative obligations of Duluth as Lessor, agreed to maintain insurance on the property, and agreed to perform all repairs and maintenance on the property in accordance with its terms. The Postmaster General was notified of this transfer. A $ 2,301,000 title insurance policy was issued to Duluth in February 1978 and a certificate of title was issued to Duluth. By letter dated March 20, 1978, the investors in Duluth were advised that the partnership had acquired the post office property and were furnished with a balance sheet and statement of income and expenses for the 9 months ended December 31, 1977. Duluth filed partnership tax returns for each of the calendar years 1977 through 1982 in which it reported its one-half share of the gross rental income, as well as deductions for depreciation, interest, maintenance, and miscellaneous expenses as follows: 1977
1978
1979
1980
1981
Rental Income
81,900 109,200 109,200 109,200 109,200 Expenses:
--   --   --   --   --   Depreciation
(101,665)
(135,553)
(135,553)
(135,553)
(135,553)
Interest
(175,718)
(223,452)
(230,913)
(150,271)
(121,374)
Maintenance
(  1,800)
(  2,400)
(  2,400)
(  2,400)
(  2,400)
Other
( 62,400)
( 33,500)
--   --   --   Net Loss
(259,683)
(285,705)
(259,666)
(179,024)
(150,127)
*91 1982
Rental Income
109,200 Expenses:
--   Depreciation
(131,438)
Interest
(122,119)
Maintenance
(  2,400)
Other
--   Net Loss
(146,757)
The partnership was on the accrual method of accounting. Petitioner maintains the books and records and is the managing partner of Duluth. The initial capital of Duluth consisted of capital contributions from the various investors totaling $ 442,500, of which $ 185,000 was received in 1977 and $ 257,500 in 1978. Of the capital contributed, $ 260,000 was paid to Solar under the Agreement of Sale, the $ 85,000 initial payment and the $ 175,000 payment due in March 1978. The investors in Duluth, their percentage interest and capital contributions were as follows: Name
Percentage
Contribution
Sol Finkelman
4.00
--
Lawrence Finkelman
1.00
--
Bergstrom
12.80
$  60,000
Biagotti
6.44
30,000
Carmichael
6.44
30,000
Crnkovitch
16.11
75,000
Dana
9.66
45,000
Dicus
6.44
30,000
Floum
12.88
60,000
Larson
9.66
45,000
Roubal
9.66
45,000
Votava
4.83
22,500
Total
[8] 100.00
$ 442,500
*92 No part of the initial capital contributed by investors was allocated to the capital accounts of petitioner or his son on the partnership returns. Solar realized a gain on the sale of the post office property to Duluth. The sale was reported on the installment basis on its partnership returns for 1977 and 1978 and a percentage of gain from the sale was included in income each year. Solar also took a deduction for interest expense paid to Joseph Penner. In April 1977, corporate bonds rated AAA yielded 8.04 percent. Corporate bonds with an A rating yielded 8.55 percent. Hacienda Bank
In 1977, Hacienda Properties Co. (Hacienda or partnership), a California limited partnership formed by petitioner, [9] entered into an agreement to purchase an interest in property located in Garden Grove, California, at 11900 Brookhurst Street. It is improved by a one-story bank building and related improvements which, on the date of purchase, were leased and occupied by Hacienda Bank. The improvements were completed in 1974 and are in excellent condition. Garden Grove is located in Orange *93 County, California, approximately 27 miles southeast of the Los Angeles Civic Center and approximately 8 miles northwest of Santa Ann. Garden Grove is connected by freeways to all parts of Los Angeles and Orange Counties. The subject property is a 1.33 acre parcel that has access to Brookhurst Street and Chapman Avenue in Garden Grove. The neighborhood is fully developed primarily with shopping centers, strip commercial, service stations and fast food restaurants. A part of the neighborhood, but not the bank property, is within the boundaries of a redevelopment area and has received financial assistance from the city's redevelopment agency for public improvements and architectural services such as landscaping and sign control. The property is zoned to permit a wide range of commercial uses including retail stores, hotels, service stations and business and professional offices. By deed dated April 23, 1973, the Home Savings and Loan Association conveyed the subject land to Hacienda Bank for a reported sales price of $ 300,000 cash. Thereafter, Hacienda Bank contracted for the construction of the improvements, which were completed in May 1974. In November 1974, Hacienda Bank *94 conveyed the land and improvements to Joseph and Grace Penner for a reported sales price of $ 600,000 cash. By a lease dated November 15, 1974, the Penners leased back the land and improvements to Hacienda Bank for a 30-year period commencing November 15, 1974, and terminating on November 14, 2004. The rent under the lease agreement is $ 66,000 per year payable $ 5,500 per month in advance on the first day of each month. The lease is a triple net lease. Maintenance, repairs, taxes, utilities and other charges are the sole responsibility of the lessee as additional rental. If the lessee is not in default, it has the option to renew the lease for an additional term of 10 years. The rental for the option term is set by mutual agreement or, failing agreement, according to "prevailing rental rates" in the area, not to fall below $ 66,000 triple net rent. On December 23, 1977, the Penners agreed to sell the improvements on the subject property, assign the existing lease and lease the land (ground lease) to Hacienda for a purchase price of $ 1,161,900. The purchase price was paid with two nonrecourse promissory notes secured by deeds of trust and assignments of rent. The first was *95 a wraparound note (Purchase Note) in the face amount of $ 1,061,900, bearing interest at the rate of 10 percent per year for the first 3 years and 5 percent thereafter. Monthly payments of $ 4,200, to be applied first to interest and then to principal, were due commencing May 1, 1977 until November 1, 2004. In addition, principal payments of $ 35,000 and $ 90,000 were due on December 31, 1977, and March 31, 1978, respectively. These initial principal payments were approximately 11 percent of the purchase price. Payments of interest were also required in the amounts of $ 200,000, $ 100,000 and $ 100,000, due on March 1, 1993, December 1, 1993, and June 1, 1995, respectively. Any unpaid balance is due November 14, 2004. The Purchase Note is subordinate to and wraps around a promissory note (Senior Note) dated August 2, 1976, in the face amount of $ 535,000 in favor of Mortgage Investment Securities, Inc., secured by a deed of trust and assignment of rents. The second note, in the face amount of $ 100,000 and bearing 10-percent interest, is due May 1, 1997. Monthly payments of interest of $ 800 per month are due under the note. Under the ground lease, Hacienda agreed to pay $ *96 6,000 per year, payable $ 500 per month, for the period from May 1, 1977 through November 14, 2004. The partnership did not receive any of the rental payments under the lease. Rather, they were applied monthly towards the purchase obligations, as follows: (1) $ 500 -- ground lease; (2) $ 4,200 -- Purchase Note; and (3) $ 800 -- second note. The Penners were obligated to make the payments on the underlying Senior Note. In May of 1978, the deed was duly recorded and a policy of title insurance was issued to Hacienda Properties Co. and Joseph and Grace Penner. Oxnard Properties (successor to Hacienda) filed partnership tax returns for each of the years 1977 through 1982 in which it reported gross rental income and depreciation, interest, and miscellaneous expenses as follows: 1977
1978
1979
1980
1981
1982
Rental Income
44,000 66,000 66,000 66,000 66,000 66,000 Expenses:
--  --   --   --   --   --   Depreciation
(45,417)
(68,126)
(68,126)
(68,126)
(68,126)
(68,126)
Interest
(78,563)
(112,212)
(115,232)
(83,183)
(65,516)
(65,841)
Ground Rent
(4,000)
(6,000)
(6,000)
(6,000)
(6,000)
(6,000)
Other
(22,050)
(8,000)
--   --   --   --   Net Loss
(106,030)
(128,338)
(123,358)
(91,309)
(73,642)
(73,967)
*97 The partnership was on the accrual method of accounting. Petitioner maintains the books and records and is the managing partner of Oxnard. The initial capital of Oxnard consisted of capital contributions from various investors totaling $ 390,000, of which $ 145,000 was received in 1977 and $ 245,000 in 1978. The investors in Oxnard, their percentage interests and their capital contributions were as follows: Name
Percentage
Contribution
Sol Finkelman
4.00
--   Lawrence Finkelman
1.00
--   Ameli
7.31
$ 30,000
Carter
3.65
15,000
Duff
21.93
90,000
Meyer
3.65
15,000
Noble
7.31
30,000
Pardasani
7.31
30,000
Poral
3.65
15,000
Rohde
3.65
15,000
Somerville
25.58
105,000
Tesoro
10.96
45,000
Total
100.00
$ 390,000
No part of the initial capital contributed by the investors was allocated to the capital accounts of petitioner or his son. The average interest rate for mortgages on commercial service property during the second quarter of 1977 was 9.55 percent. Bank of Florida
In 1977, Seaside Properties Co. (Seaside), a California partnership formed by petitioner, purchased an interest in certain real estate *98 located at 2350 34th Street N. in the city of St. Petersburg, Pinellas County, Florida. It consists of two parcels totaling 2.45 acres. Parcel number 1 is improved by a two-story bank building and by parking lots. Parcel number 2 is improved by a drive-through banking facility. At the time of purchase, the land and improvements were leased to the Bank of Florida Corporation for use as a banking facility by the Bank of Florida. The first parcel and part of the second are zoned C-LD (Commercial, Low Density). The balance of the second parcel is zoned R-3 (Multifamily Residence). The St. Petersburg Land Use Plan designates the entirety of both parcels as "retail/office service." On September 7, 1976, the Penners entered into a lease with the Bank of Florida Corporation with respect to the St. Petersburg property. The initial term of the lease was for 29 years, commencing upon substantial completion of improvements and upon issuance of the temporary certificate of occupancy. The Penners had agreed to construct the improvements in accordance with the terms of a sale and leaseback agreement with the Bank of Florida. The improvements were completed in 1977. They are competitive *99 with, and physically and functionally similar to, other contemporary banking facilities in the St. Petersburg area. The annual base rental required by the lease was $ 59,000 plus an amount equal to the cost of the real property to the Penners ($ 350,000) and all direct and indirect costs of construction and other costs exceeding $ 550,000 times .1075, payable monthly in advance. The monthly rental paid by the Bank of Florida under the lease during 1977 and thereafter was $ 10,629.34. The lease is a triple net lease. If the lessee is not in default, it has the option to renew the lease for two terms of 11 years each. The rental during the option periods is a mutually agreed upon amount, or, failing agreement, the "prevailing rental rate" for commercial property in St. Petersburg, not to fall below the base rental. In June 1977, the Penners took a mortgaged loan (Senior Note) in the original amount of $ 980,000 in favor of Mortgage Investment Securities, Inc. The note bears interest at the rate of 9-3/8 percent and requires monthly payments of $ 8,151.15 commencing August 1, 1977, and ending June 1, 2002, with any unpaid balance also due on that date. The mortgage and an assignment *100 of rents secures the indebtedness. [10]
By agreement of purchase and sale dated December 23, 1977, the Penners sold the improvements, assigned the lease, and leased the land (ground lease) to Seaside for a price of $ 2,259,900. The price was paid by a wraparound nonrecourse promissory note (Purchase Note), executed April 5, 1978, secured by a mortgage and collateral assignment of lease. The Purchase Note requires monthly payments in the amount of $ 9,629.34 commencing on June 1, 1977, and continuing through May 1, 2006. The payments are applied first to interest and then to principal. The note bears interest for the first 3 years at 10 percent and at 5 percent thereafter. Payments of principal were required in the amounts of $ 71,000 and $ 170,000 on December 31, 1977, and March 31, 1978, respectively. These payments represented approximately 10.6 percent of the purchase price. Additional payments of interest in the amounts of $ 400,000, $ 200,000 and $ 200,000 are due March 1, 1993, December 1, 1993 and June 1, 1995, respectively. Any balance remaining was due May 31, 2006. The *101 Purchase Note is subordinate to and "wraps around" the $ 980,000 Senior Note. Seaside did not receive any of the rental payments. Rather, the $ 10,629.34 monthly rental was applied as follows: (1) Ground lease -- $ 1,000; and (2) Purchase Note -- $ 9,629.34. The Penners are obligated to make the payments on the Senior Note. The deed to the improvements was not recorded. By letter dated March 20, 1978, the investors were advised that Seaside had acquired an interest in the Bank of Florida property and were furnished with a balance sheet and statement of income and expenses for the period ended December 31, 1977. Seaside filed partnership tax returns for the years 1977 through 1982 in which it reported gross rental income as well as deductions for depreciation, interest and other expenses, as follows: 1977
1978
1979
1980
1981
Rental Income
74,406 127,552 127,552 127,552 127,552 Expenses:
--   --    --    --    --    Depreciation
( 75,769)
(129,889)
(129,889)
(129,889)
(129,889)
Interest
(133,461)
(217,494)
(223,551)
(164,773)
(117,244)
Maintenance
(7,000)
(12,000)
(12,000)
(12,000)
(12,000)
Other
(59,000)
(30,000)
Net Loss
(200,824)
(261,831)
(237,888)
(179,110)
(131,581)
*102 1982
Rental Income
127,552 Expenses:
--    Depreciation
(129,889)
Interest
(117,331)
Maintenance
(12,000)
Other
Net Loss
(131,668)
The partnership was on the accrual method of accounting. Petitioner maintains the books and records and is the managing partner of Seaside. The initial capital of Seaside consisted of capital contributions from various investors totaling $ 330,000, $ 133,000 received in 1977 and $ 197,000 in 1978. The initial investors in Seaside, their percentage interests and capital contributions as shown on the 1977 return were as follows: Name
Percentage
Contribution
Sol Finkelman
4.00
--   Lawrence Finkelman
1.00
--   Sol Finkelman
10.80
$  37,500
Baxter
6.47
22,500
Cabral
4.32
15,000
H. Finkelman
4.32
15,000
Funk
4.32
15,000
Goldman
4.32
15,000
Larson
4.32
15,000
Lawson
4.32
15,000
Pathak
4.32
15,000
Pirachi
4.32
15,000
Prince
6.47
22,500
Reiswig
8.63
30,000
Scofield
4.32
15,000
Shah
4.32
15,000
Stahle
2.16
7,500
Thomas
4.32
15,000
Wintner
8.63
30,000
Zahir
4.32
15,000
Total
100.00
$ 330,000
In 1978, two *103 additional partners were added. The partnership percentages set forth above remained the same with the exception of the following: S. Finkelman
2.16
Klein
4.32
Rasinski
4.32
First Valley Bank
In 1979, petitioner entered into an installment sale agreement to purchase certain property located in Bethlehem, Pennsylvania. The property is located at One Bethlehem Plaza. It is improved by an eleven-story building, vehicle loading area and miscellaneous improvements. At the time of purchase, the property was leased to First Valley Bank for use as a banking facility and office building. The improvements were constructed in 1974 by First Valley Properties, Inc. and are in excellent condition. By lease agreement dated November 14, 1978, First Valley Properties, Inc., a Pennsylvania business corporation of which Joseph and Grace Penner were the sole shareholders, leased the land and improvements to First Valley Bank, a Pennsylvania banking institution. The initial term of the lease is for a period of 22 years beginning November 14, 1978, and ending November 13, 2000. The annual rent during the initial term of the lease is $ 830,000 per year for the first *104 11 years and $ 850,000 per year thereafter. Rent is payable $ 69,166.67 in advance each month during the first 11 years, and $ 70,833.33 in advance per month thereafter. The lease is a triple net lease. The lessee has the option to renew for four option periods, the first of 8 years and the subsequent three for 10 years each. The annual rent during each of the extension periods is $ 870,000 ($ 72,500 per month), $ 890,000 ($ 74,166.67 per month), $ 910,000 ($ 75,833.33 per month) and $ 930,000 ($ 77,500 per month), respectively. The lease was assigned to the Penners in a liquidating distribution of First Valley Properties on November 14, 1978. By installment sale agreement made as of October 12, 1979, the Penners contracted to sell the land and improvements to petitioner. The agreement was subsequently amended by the parties and confirmed by an undated letter from Penner which was acknowledged on April 30, 1983, by petitioner. A memorandum of installment sale agreement dated February 25, 1985, was subsequently recorded. At the time the installment sales agreement was entered into, the property was subject to two notes in favor of Continental Illinois Bank and Trust Company *105 of Chicago in the aggregate principal sum of $ 8,000,000 which were secured by two mortgages, a security agreement and a financing statement on the premises. One note was in the principal amount of $ 6,500,000 and the other note represented the remainder. The notes were due on or before May 13, 1979. The sale agreement provided that the seller had the right to refinance the property by paying off the aforementioned notes and securing financing at the seller's sole cost and expense. The replacement notes would be secured by a first mortgage and related documents and would constitute the first lien on the property. In no event could the original amount of the replacement note exceed $ 9,000,000, and in no event could the monthly debt service exceed the monthly rent payable by First Valley Bank during the first 11 years of the lease term. The purchase price of the property was $ 12,500,000, $ 12,300,000 specified in the installment sale agreement and $ 200,000 in a junior note. The $ 12,300,000 amount bears interest at 11 percent per year for 3 years and 6-1/2 percent thereafter. The average interest rate for mortgages on office buildings during the fourth quarter of 1978 was *106 9.81 percent. Monthly payments were required under the installment sale agreement as follows: Period
Monthly Payment
1/1/79  -  7/1/79
$ 69,166.67
8/1/79  -  1/1/80
90,529.00
2/1/80  -  4/1/80
86,503.00
5/1/80  -  1/1/81
82,431.00
2/1/81  -  4/1/81
75,754.00
5/1/81  -  12/1/89
69,166.67
1/1/90  -  11/1/2000
70,833.33
The agreement was apparently orally amended so that the monthly payments did not exceed the rent paid by the lessee ($ 69,166.67). [11] Each monthly payment was to be applied first to interest and then to principal. Any unpaid balance was due on December 1, 2000. Additional payments were required as follows: (1) $ 483,000 due December 31, 1979; (2) $ 488,750 due March 31, 1980; (3) $ 671,625 due December 31, 1980; and (4) $ 791,625 due March 31, 1981. These payments represented 19.4 percent of the total purchase price. Also, payments of $ 975,000 are due on September 30, 1992, and September 30, 1993. The $ 200,000 note bears interest at the rate of 11 percent and is due January 1, 2004. [12]
*107 The lease was used as security under the agreement. Petitioner does not receive the rents under the lease. Rather, they are paid directly to the Penners as the required payments under the sale agreement. Petitioner had the right of possession and control of the premises subject to the lease and subleases upon execution of the sale agreement. The Penners are obligated to make the required payments on the underlying indebtedness and any replacement (refinancing) indebtedness. By letter dated October 12, 1979, the Penners authorized a transfer of the property so long as petitioner continued to control it. Bethlehem Properties Co. is a joint venture formed as of January 1, 1979, to acquire, develop, lease, operate and sell the First Valley Bank property. Petitioner is the managing general partner. Bethlehem Properties Co. filed partnership tax returns for each of the calendar years 1979 through 1982 in which it reported gross rental income as well as deductions for depreciation, interest and miscellaneous expenses with respect to First Valley Bank property as follows: 1979
1980
1981
1982
Rental Income
830,000 830,000 830,000 830,000 Expenses:
--   --   --     --    Depreciation
(1,455,073)
(1,455,073)
(1,455,073)
(1,070,129)
Interest
(1,461,049)
(1,395,954)
(1,294,922)
(779,345)
Administration
(79,000)
(39,750)
--     --    Organization
(28,500)
(28,500)
(28,500)
(28,500)
Legal/Accounting
(158,500)
(79,000)
--     --    Net Loss
(2,352,122)
(2,168,277)
(1,948,495)
(1,047,974)
*108 The partnership was on the accrual method of accounting. Petitioner maintains the books and records and is the managing partner of Bethlehem. The initial capital of Bethlehem consisted of capital contributions from various investors totaling $ 2,850,000, of which $ 768,725 was contributed in 1979, $ 1,463,775 in 1980, and $ 617,500 in 1981. The investors in Bethlehem, their percentage interests and their capital contributions are reflected in the partnership tax returns. No part of the initial capital contributed by the investors was allocated to the capital accounts of Sol or Lawrence Finkelman. By letter dated April 16, 1980, a balance sheet and statement of income and expense for the period ended December 31, 1979, was forwarded to the investors together with a copy of the joint venture agreement and a signature page which each investor was asked to sign and return. Progressive Savings and Loan
In 1980, petitioner entered into an agreement to purchase an interest in property located in Studio City, California. The property in question is improved by a two-story bank building and related improvements which, on the date of purchase, were leased to and occupied *109 by Progressive Savings and Loan Association (Progressive). The property is located at 12175 Ventura Boulevard, Studio City, California. Studio City is a community located in the San Fernando Valley area of Southern California and is a part of the city of Los Angeles. The improvements were extensively remodeled in 1977 and were in excellent condition. On June 9, 1977, JSCK Corporation deeded the property to Progressive. Progressive subsequently remodeled the improvements and then deeded the property to the Penners on March 5, 1979, for a reported consideration of $ 1,200,000. Progressive leased the property back from the Penners. The initial term of the lease was for 30 years, commencing on March 14, 1979, and terminating on March 14, 2009. Under the terms of the lease, Progressive is obligated to pay rentals of $ 9,250 per month for the first 15 years of the lease, and $ 9,500 per month thereafter. [13] The lease is a triple net lease. Progressive has the option to renew the lease for an additional 20 years. The monthly rental during the option period is equal to 9-3/8 percent of the fair market value of the property as of the last day of the 30-year term, but the rent cannot *110 fall below $ 9,500 and cannot exceed $ 9,500 compounded at 3 percent for 30 years. If the parties cannot agree, the lease provides a procedure for determining fair market value. By agreement of purchase and sale dated November 26, 1980, the Penners agreed to sell the improvements on the subject property, to assign their interest in the lease and to lease the land (ground lease) to petitioner. The purchase price was $ 1,690,000, paid with two promissory notes. The first (Purchase Note) was a wraparound promissory note in the face amount of $ 1,642,500 dated November 26, 1980. The second was a junior note in the face amount of $ 47,500. Both notes are nonrecourse and secured by deeds of trust and collateral assignments of lease. Under the terms of the Purchase Note, petitioner is obligated to pay the Penners $ 6,918 per month commencing January 1, 1980 until December 1, 1994, and $ 7,168 per month from January 1, 1995, until maturity. The monthly payments are applied first to interest and then to principal. The note bears interest at the rate of 15 percent per year for the first 3 years and 6 percent *111 per year thereafter. The average interest rate for mortgages on commercial service property during the fourth quarter of 1979 was 10.82 percent. In addition to the monthly payments, payments of principal were required as follows: (1) $ 79,000 due December 31, 1980; (2) $ 90,000 due March 31, 1981; (3) $ 85,000 due December 31, 1981; and (4) $ 103,000 due March 31, 1982. These payments represented 21 percent of the purchase price. Also, payments of $ 370,000 and $ 315,000 were due on June 30, 1995, and October 1, 1995, respectively. The unpaid balance is due December 31, 1999. Petitioner, by letter agreement, was granted the right to prepay the note at a discount between January 1 and March 31, 1995. The Purchase Note is subordinate to and wraps around two promissory notes, one dated May 21, 1980, in the amount of $ 686,300 in favor of Coast Federal Savings and Loan, and the second in the amount of $ 547,000. Both were secured by deeds of trust and assignments of rents. The junior note, in the amount of $ 47,500, is due on or before December 1, 1995. It bears interest at the rate of 15 percent per year for the first 4 years and 6 percent thereafter. Monthly payments of $ *112 483.80 are required, applied first to interest and then to principal. [14]
The monthly rent under the ground lease for the period January 1, 1980 to December 31, 1999, was $ 1,848. The deeds of trust and assignments of rent were duly recorded in the land records. Petitioner did not receive any of the monthly rentals from Progressive. The $ 9,250 monthly rental was applied as follows: (1) $ 1,848 -- ground lease; (2) $ 6,918 -- Purchase Note; and (3) $ 484 -- junior note. The Penners are required to make the payments on the underlying indebtedness. Progressive Properties Co. is a joint venture formed as of January 1, 1980, to acquire, develop, lease, operate and sell the Studio City property and other properties. Petitioner is the managing general partner of the joint venture. Progressive Properties Co. filed partnership tax returns for each of the calendar years 1980 through 1982 in which it reported gross rental income as well as deductions for depreciation, interest and miscellaneous expenses with respect to the Studio City property as follows: *113 1980
1981
1982
Rental Income
111,000 111,000 111,000 Expenses:
--   --   --   Depreciation
(133,655)
(133,655)
(133,655)
Interest
(272,943)
(279,194)
(280,127)
Ground Rent
(22,176)
(22,176)
(22,176)
Legal/Accounting
(43,978)
(15,018)
--   Administrative
(21,999)
(7,502)
--   Organization
(5,765)
(3,937)
(3,937)
Net Loss
(389,516)
(350,482)
(328,895)
The partnership was on the accrual method of accounting. Petitioner maintains the books and records and is the managing partner of Progressive Properties Co. The initial capital contribution of Progressive Properties Co. consisted of capital contributions from various investors totaling $ 2,910,000, of which $ 737,200 was contributed in 1980, $ 1,552,000 in 1981 and $ 620,800 in 1982. By letter dated April 1, 1981, the investors were furnished a balance sheet and statement of income and expenses for the period ending December 31, 1980, together with a copy of the joint venture agreement and a signature page that each investor was asked to sign and return. Valuation
Each of the parties offered expert opinions *114 regarding the fair market value of the properties. We find the fair market values of the test properties, at the time purportedly acquired by petitioner or his partnerships, to be as follows: Duluth Post Office
$ 1,338,855
Hacienda Bank
740,677
Bank of Florida
1,397,897
First Valley Bank
9,010,991
Progressive Savings and Loan
980,025
OPINION The major issue in this case concerns the tax consequences of leveraged real estate transactions; more specifically, whether the transactions must be disregarded for Federal tax purposes because they lacked economic substance and/or were primarily engaged in for tax motivated reasons. If we determine that the transactions are not to be respected, we must consider whether any of the additions to tax are applicable. Burden of Proof
As a preliminary matter, petitioner argues that the burden of going forward with the evidence should be on respondent because one of the notices of deficiency did not give adequate grounds upon which to prepare a case. The statutory notice language in controversy is that petitioner was "not entitled" to the partnership losses at issue, without further detail. As a general rule, *115 petitioner bears the burden of going forward concerning matters stated in the notice of deficiency. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). However, in a limited number of cases an exception to the general rule may arise involving unreported illegal income. In such cases, courts have "looked behind the notice of deficiency" and removed the presumption of correctness when the determination is arbitrary or without foundation. See Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979); Pizzarello v. United States,408 F.2d 579 (2d Cir. 1969); Riland v. Commissioner,79 T.C. 185 (1982). In these cases the presumption of correctness is removed and the burden of going forward shifts to respondent. Similar considerations do not readily apply with respect to disallowed deductions. The taxpayer has (or should have) complete knowledge of items deducted on his return, and should be able to prove or support the deduction(s). The Court of Appeals for the Ninth Circuit, where appeal would lie in this case, has held that the Commissioner need not make any factual showing in support of a deficiency determination *116 based on the disallowance of deductions. United States v. Zolla,724 F.2d 808 (9th Cir. 1984); Karme v. Commissioner,673 F.2d 1062 (9th Cir. 1982), affg. 73 T.C. 1163 (1980). See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Although respondent's explanation of the disallowed loss deduction is terse, it is sufficient to apprise petitioner of respondent's determination. This is not the type of situation where respondent's determination could be considered to be no determination or to be arbitrary so that the burden of going forward with the evidence shifted to respondent. See Scar v. Commissioner,814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983). Thus, the burden of going forward does not shift to respondent. Claimed Losses - General
The central focus of this case involves losses claimed through real estate partnerships organized, directed and controlled by petitioner, Sol Finkelman. The loss deductions are composed of interest, depreciation and other administrative expenses. Respondent attacks these transactions by means *117 of three major theories: (1) Economic substance; (2) profit objective; and (3) genuine indebtedness. The economic reality of a transaction, rather than the form in which it is cast, governs for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Grodt and McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). A transaction entered into solely to generate tax benefits, with no other economic or commercial objective to support it, is given no effect for tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Knetsch v. United States,364 U.S. 361 (1960). Thus, an initial inquiry is whether a sale of the subject properties occurred for tax purposes. A related inquiry is whether the taxpayer entered into the transaction with the objective of making a profit. See secs. 162, 165, 183 and 212. We commented on this requirement in Beck v. Commissioner,85 T.C. 557, 569-570 (1985), as follows: Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making *118 a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. * * *. "Profit" in this context means economic profit, independent of tax savings. Herrick v. Commissioner, [85 T.C. 237 (1985)]; Surloff v. Commissioner,81 T.C. 210, 233 (1983). Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement of his intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); sec. 1.183-2, *119 Income Tax Regs. * * * [Fn. ref. omitted.] A third inquiry, similar to the economic substance question, relates to the indebtedness used to finance a transaction and involves both depreciation and interest deductions. If the purchase price and principal amount of a nonrecourse note unreasonably exceed the fair market value of the asset acquired, the note may not be considered genuine indebtedness. Under such circumstances the amount of the note will not be included in the basis of the asset and "interest" paid is not deductible. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Elliott v. Commissioner,84 T.C. 227 (1985), affd. without opinion 782 F.2d 1027 (3d Cir. 1986); Odend'hal v. Commissioner,80 T.C. 588, 604 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984). We have used objective factors in resolving all three of these questions, even in cases involving what is nominally the taxpayer's subjective intent -- profit objective. See Rose v. Commissioner,88 T.C. 386 (1987). In addition, with regard to each of these *120 theories, two factors usually predominate -- the relationship of purchase price to fair market value and the recourse or nonrecourse character of the debt. Closer inspection reveals why these factors have been the central focus. One of the hallmarks of so-called "abusive tax shelters" is economic distortion occasioned by the purported transfer of ownership at grossly inflated prices. The nonrecourse "debt" assures that the "purchaser" can walk away from the transaction at any time. The inflated purchase price generally assures that the transaction cannot economically succeed, except to provide artificially bloated depreciation deductions and investment tax credits. In general, a grossly inflated purchase price would lessen the rate of return, make resale at a profit unlikely, and make it less likely that the purchase price will be paid. "The fundamental issue in these cases generally will be whether the property has been 'acquired' at an artificially high price, having little relation to its fair market value." Estate of Franklin v. Commissioner, supra at 1046 n. 1. Both parties rely heavily on Estate of Franklin v. Commissioner, supra, to justify their *121 respective positions. In that case, a limited partnership was formed to purchase a hotel and lease it back to the former owners. The purchase price was $ 1,224,000, financed entirely with nonrecourse indebtedness. The only cash paid by the partnership was $ 75,000, denominated as prepaid interest. No other money was to change hands for 10 years, because payments on the purchase price were arranged to exactly equal the rental due under the lease. After 10 years, the balance of $ 975,000 was due, less any indebtedness of the former owners assumed by the partnership. The former owners had purchased the hotel property [15] several months before the sale for approximately $ 660,000. We held that partnership losses attributable to depreciation deductions and interest expense were not allowable, because all the partnership had, in essence, was an option to purchase the property. The nonrecourse character of the debt, the fact that little money changed hands, and the failure *122 of the taxpayer to establish the value of the property were all relevant factors in finding an option. Because the optionee/partnership had no obligation to consummate the transaction, no depreciation or interest based on the "indebtedness" were allowable. Estate of Franklin v. Commissioner,64 T.C. 752, 762 (1975). The Ninth Circuit Court of Appeals affirmed, based on slightly different reasoning. While not disavowing the other factors we recognized, the Court stated "the fundamental issue in these cases generally will be whether the property has been 'acquired' at an artificially high price, having little relation to its fair market value." Estate of Franklin v. Commissioner, supra at 1046 n. 1. The Court found that the transaction could not be treated as a sale, ab initio, because the purchase price exceeded a "demonstrably reasonable estimate of [the property's] fair market value." The Ninth Circuit then went into a more detailed analysis of the specific deductions involved, depreciation and interest, and how the purchase price to market value relationship would impact such deductions. Depreciation, the Court said, is not predicated upon *123 ownership but upon an investment in property. Estate of Franklin v. Commissioner, supra at 1049; Gladding Dry Goods Co. v. Commissioner,2 B.T.A. 336 (1925). Payments of the purchase price must yield an equity to the purchaser, or there is no such investment in the property upon which to base depreciation deductions. The interest deduction also received extended discussion. The absence of personal liability, the Court noted, does not deprive a debt of its character as a bona fide obligation able to support an interest deduction. Estate of Franklin v. Commissioner, supra; Mayerson v. Commissioner,47 T.C. 340 (1966). However, if the purchase price and debt amount unreasonably exceed the value of the property, in the absence of personal liability there is only a "mere chance" that payment will actually occur. For debt to exist, the purchaser must confront a situation in which it is presently reasonable from an economic point of view to make a capital investment in the unpaid purchase price. The Court warned at the end of its opinion that its holding was limited, and that it did not stand for the proposition that "a sale *124 is not a sale if the purchaser pays too much." Estate of Franklin v. Commissioner,544 F.2d 1045, 1049 (9th Cir. 1976). Fair Market Valuation
We consider here, for the first time, a novel conceptual theory of valuation. Normally, we accept the principle that fair market value is the price that a willing seller and buyer would agree upon. Implicit in that formulation is an accepted premise that the price is based upon an exchange of cash for the asset in question. Although the cost of borrowing capital may have a generalized effect upon prices in the market place, here petitioner contends that purchase price or value has a direct relationship to interest rates. As a premise, petitioner defines a range of interest rates from which persons may choose to finance an investment. The lower end of this spectrum is the rate set in section 483. [16] Any lower interest rate and part of the price will be recharacterized as interest. The highest interest rate is at or near market rates. Any higher, and as a practical matter, the investor merely refinances at more favorable rates. *125 Petitioner's interest rate premise serves as the foundation for his "fulcrum principle." Petitioner asserts that the purchaser of an income producing asset is willing to pay a premium purchase price for below-market financing. In other words, the lower the interest rate used to finance the purchase, the higher the value, and vice versa. Petitioner further suggests that the seller is willing to accept these terms because he receives the same amount because of the inversely proportionate relationship between the interest rate and purchase price. For example, $ 1,000,000 financed at 9 percent for 20 years is the equivalent of $ 1,365,185 financed at 5 percent for a like term. Both will be completely amortized by payments of $ 109,546 per year over the term. Petitioner argues that favorable under-market seller financing increases the fair market value of the asset. He argues that fair market value should be redefined to mean value as financed. While we find petitioner's argument novel and on the surface appealing, we do not adopt it for purposes of determining fair market value. Fair market value is the price at which property would change hands between a willing buyer and *126 a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.; sec. 20.2031-1(b), Estate Tax Regs.; Chiu v. Commissioner,84 T.C. 722, 730 (1985). For the following reasons, we hold that petitioner's concept of "under-market seller financing" is irrelevant in determining fair market value. A seller-financed transaction is the amalgam of two distinct transactions. First, there is a transfer of the asset from the seller to the buyer. Then, there is a "loan" from the seller to the purchaser of all or a portion of the purchase price. If the "loan" is at rates that are under market, the seller/lender will generally lose money on the loan part of the transaction. Theoretically, the difference may be adjusted in the purchase price as between a particular seller and buyer. This adjustment is the factor that petitioner contends increases fair market value. It is reasonable to state that a particular purchaser may be willing to pay more if provided with under-market seller financing. Although the extra amounts may be labeled as principal, in reality they constitute *127 amounts paid for the use of money or interest. [17] See Deputy v. duPont,308 U.S. 488, 498 (1940); Old Colony R. Co. v. Commissioner,284 U.S. 552, 560 (1932). Conversely, if a seller is willing to provide under-market financing it may be an indication that the value of the asset is less than the stated price. As petitioner has amply demonstrated, there is no economic difference between market and below-market rates that is not made up by the price differential. Petitioner has failed to prove that there is any incremental fair market value from below-market financing beyond the difference between market and below-market interest. Petitioner contends that below-market interest causes a more rapid *128 equity buildup that enhances value. While this is true, quicker equity buildup is correspondingly subject to a larger total debt amount and thus they are relatively approximately equal. [18] In any event, petitioner has not successfully quantified the effect, if any, this difference would have on value in the context of this case. Petitioner referenced several cases in support of his proposition that favorable seller financing impacts on fair market value. In Mayerson v. Commissioner,47 T.C. 340 (1966), we held that a 99-year note given to purchase a building requiring minimal principal payments was nonetheless valid indebtedness that could be included in the taxpayer's basis in the building. The parties negotiated a cash price of $ 275,000, or a financed price of$ 332,000. If the buyer could obtain refinancing within 3 years, the note could be prepaid at a discount. In Curry v. Commissioner,43 T.C. 667 (1965), we upheld the sale of a building to a corporation related *129 to the sellers against a claim that it was a section 351 contribution with the interest representing dividends to the sellers. In that case we commented, "The fact that a fair cash price * * * would have been less than [the purchase price] is of little significance. There is quite a difference between a cash sale and a sale on terms." Curry v. Commissioner, supra at 694. In Commissioner v. Brown,380 U.S. 563 (1965), affg. 325 F.2d 313 (9th Cir. 1963), affg. 37 T.C. 461 (1961), the Supreme Court upheld the sale of a business, affirming our findings that the sales price was "within a reasonable range" of the appraised value. The price in that case was paid by a 10-year non-interest-bearing note. See also Union Bank v. United States,285 F.2d 126 (Ct.Cl. 1961). There are a number of distinguishing characteristics between those cases and the instant case. In each of the cited cases the courts found that the sales were the results of arm's-length negotiations. We do not unqualifiedly make such findings here. (See discussion on "arms length dealing" infra.) The courts in the cited cases did not *130 attempt to specifically evaluate the effect, if any, favorable financing had on value, because the price was considered to be in a normal or reasonable range. In addition, in Curry we specifically made no finding as to fair market value. In Mayerson, it appears that the interest rates charged were not below market, thus there was no favorable financing. Moreover, none of the cases involved price to fair market value (or cash price) ratios in excess of 130 percent. In another vein, the cited cases are somewhat different because they were decided in a different economic climate. Twenty to twenty-five years ago interest rates were, at most, 5 or 6 percent. The range available for economic maneuvering was small when compared to the period under consideration. During the years in issue, the prime rate had begun to climb precipitously, and would eventually exceed 20 percent. Finally, in a recent case we implicitly rejected notions that fair market value may be based upon or is theoretically supported by favorable seller financing. In Goldstein v. Commissioner,89 T.C. 535 (1987), the taxpayers purchased a number of posters and subsequently donated them to *131 a charitable organization. The purchase price was $ 20,000, $ 4,000 cash and promissory notes bearing interest at 9 percent, at a time when the prime interest rate was near 20 percent. We decided fair market value of the posters by discounting the notes to present value (using market or prime interest rates) and adding that value to the cash outlay. In Goldstein we found that the fair market value of the posters was $ 4,816. This holding neutralizes the artificial effect that financing could have upon fair market value. [19]
Petitioner has confused price with fair market value. Below-market financing merely is a conversion or exchange of interest and principal. For the foregoing reasons, the fair market value of the properties must be segregated from the concept of financing the "purchase." There are three basic methods used to value real property (or other assets). The comparable sales method involves comparisons of the subject property to similar *132 properties sold in the same time frame and geographic area. The replacement cost method values the property based on the cost of replacing the land and building currently less an allowance for depreciation. The income forecast method involves discounting to present value the expected income from the property. In the case of property subject to long term net leases, the income forecast method is the most suitable method of valuation. This method involves discounting to present value the stream of future rental payments. In addition, if the "purchaser" has a reversion after the lease expires, the reversion must be valued. Thus, the two elements to be valued are cash flow and future appreciation. See Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982). We have assumed that petitioner either owned or had an option to purchase the reversionary interest, even though the existence of these purchase options is less than clear. In determining the income stream, the rentals under the contract were reduced by ground rents and maintenance charges, if any. In valuing the properties, we assumed that the partnerships would receive *133 the rental payments (reduced by maintenance charges and ground rents), even though Penner actually received the rentals as payments on the purchase price. We valued the reversions by projecting the rentals for a number of years (between 30 and 40) beyond the initial lease term, either under the lease renewal terms, or by assuming an increase of 3 percent a year in the base rental rate. This was discounted back to the end of the first lease term, and then discounted back to the point of purchase. [20]
*134 The discount rate applicable to the income stream is a major determinant of value. The discount rate is a function of the risk of the venture and the general rate of inflation. It takes into account the general risks involving income-producing real estate: that the lessee will not renew and any attendant temporary vacancies; any decline in the rate of rentals in the areas; business failure by the lessee; etc. The riskier the venture the greater the rate of return necessary to compensate for that risk. Because the tenants were long term and credit worthy, the investments are of relatively low risk. However, the income stream is fixed by the lease terms. In a similar manner as fixed income instruments, increased external interest rates decrease market value. Further, there is additional risk usually associated with leveraging (borrowing money to finance) an investment. Leveraging can multiply the rate of return under favorable circumstances, but it will also multiply the negative rate of return if the investment sours. Thus, the risk of this venture is similar to that of a corporate bond or a commercial mortgage. We adopt respondent's expert's approach of using a discount *135 rate approximating the rate for mortgages for commercial service property (Hacienda, Bank of Florida, Progressive) or office buildings (Bethlehem), except as to the Duluth Post Office. For that property, respondent's expert used a rate slightly higher than the corporate AAA bonds rate, because the income stream is safer. We agree. [21]
Petitioner argues that we should use a discount rate equal to the rate of financing. [22] This is simply a correlative way of stating an argument we have already rejected -- that below market financing increases fair market value. Set forth below are the fair market values we have found, along with petitioner's and respondent's experts' conclusions, and their respective price to fair market value ratios: Property
Price
FMV
Ratio
Petitioner
Ratio
Resp. [23]
Duluth
$  2,301,000
1,338,855
172%
$  1,730,000
133%
$ 1,310,000
Hacienda
1,161,900
740,677
157%
1,080,000
108%
735,000
Seaside
2,259,900
1,397,897
162%
2,390,000
95%
1,260,000
Bethlehem
12,500,000
9,010,991
139%
11,000,000
114%
8,000,000
Progressive
1,690,000
980,025
172%
1,130,000
150%
994,000
*136 Property
Ratio
Duluth
176%
Hacienda
158%
Seaside
179%
Bethlehem
156%
Progressive
170%
Thus, even using assumptions highly favorable to petitioner (except as to discount rates), petitioner's claimed price ranged from 39 to 72 percent more than fair market value. Further, we did not include in the price the cost to purchase the reversions (for properties with only ground leases). [24] Nor did we reduce from our value determination the legal and administrative expenses that would have some effect on return, and, therefore, on fair market value. These amounted to substantial sums, as evidenced by amounts deducted on the partnership returns. In addition, we find it relevant that price even exceeded value "as financed," as defined by petitioner's expert, by 8 to 50 percent. [25] While the price to fair market value ratios in this case are not inherently egregious, [26] the difference in absolute terms amounts to hundreds of thousands *137 of dollars. Respondent's experts also expressed replacement cost and market comparison valuations that correspond with and support the income approach figures. In addition, we find it highly relevant that the purchase prices greatly exceeded the price paid by the Penners for the properties, even where the two purchases occurred within a short time of each other. While we do not expect the seller to sell at his cost, it seems less likely that the properties appreciated to the extent proposed by petitioner in the short time (usually *138 less than 3 years) between Penner's purchase and resale. The purchase price for the Duluth Post Office in 1977 exceeded the lessee's option price in the year 2000, 23 years later. This option would likely diminish, if not eliminate, a purchaser's opportunity to benefit from any future appreciation. We find that the purchase price exceeded a "demonstrably reasonable estimate of the fair market value." Estate of Franklin v. Commissioner,544 F.2d 1045, 1048 (9th Cir. 1976); Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Arm's-Length Negotiations
Although petitioner and Penner negotiated about the terms, including price and down payment, in the context of this case we do not find this relationship to be at "arm's-length" in the ordinary sense of that term. [27] Petitioner and Penner were not ordinary "willing buyers and sellers" in an open market situation. They, instead, were agreeable to specialized transactions orchestrated to produce a financial solution and tax result. Penner was apparently interested in raising capital in a market where interest rates were on the rise and petitioner *139 in obtaining tax benefits for his clientele. First the parties agreed upon a cash price, [28] and then petitioner would submit the transaction with terms. Once the parties agreed upon a cash price -- except to the extent that it was necessary to negotiate the amount of the down payments -- it is doubtful that they were truly dealing at arm's length. In a seller-financed transaction at market rates, the seller would intend to realize a gain on the sale of property plus annual interest income. For the years involved the gain from the property sale would probably be subject to favorable tax treatment -- capital gains rates and installment sale treatment. The interest portion is ordinary income. It usually is in the seller's interest to increase the favorably taxed portion, thus it usually is *140 better to increase the purchase price at the expense of a few percentage points of interest. The buyer here was also receptive to such treatment. While he loses an increased interest deduction, this is made up by the increased deduction for depreciation. The increased purchase price results in a potentially increased depreciable cost basis. See secs. 167, 1001, 1012. In this scenario, petitioner also would have been entitled to increased interest deductions, attributable to market rates at the beginning of the term. The accrual basis partnerships could deduct such amounts, whether actually paid or not. The Penners would not have to report such income until actually received if, assuming as we do for purposes of this illustration, they were on the cash method of accounting. "An allocation by a buyer *141 and a seller will be ignored if it is * * * not a result of arm's-length negotiations between parties with adverse tax motivations." Landry v. Commissioner,86 T.C. 1284, 1307 (1986). (citations omitted.) Thus, using these objective indicia, we find that petitioner and Penner were not dealing at arm's length. Financing
Petitioner touts his concept of "below-market financing" as the foundation and substance for these transactions. We think the financing method reflects an absence of arm's-length dealing. The transactions were purposely structured so that the partnerships did not receive any cash flow. All the rentals went to the Penners (as they had before the transaction) as either payments on notes, maintenance fees or ground rents. This places petitioner's chances for economic profit solely on the possibility of appreciation in value of the underlying properties, which is lessened by the artificially large purchase price. In addition, the Penners were in essentially the same position as if they had not sold the property -- they received the rentals and paid the underlying senior indebtedness. Additionally, they received part of the cash contributed to *142 each partnership in the form of a down payment. For four out of five of the properties, there was negative amortization -- the interest accruing on the debt exceeded the payments. Thus, until the balloon payments were made (at a time remote to the inception of the transactions), petitioner and the investors had no equity in the property. Depreciation would be based upon a seemingly illusory investment in property, where payments of the purchase price yielded no equity to the purchaser. Estate of Franklin v. Commissioner, supra at 1049. The balloon payments also arouse some suspicion. These payments, usually due 10 to 15 years after the purchase, were two to four times the amount of the original down payments. Because the properties yielded no cash flow, the investors would have to come up with this money from other sources. There also appears to be no business purpose for the interest rate differential. The interest ran at market rates for 3 years and then dropped to a level well below market. While petitioner claims that the below-market financing increased the value of the property (a contention we do not accept), there does not appear to be any non-tax *143 justification for the variations and the market interest in the initial three years. Given our finding that the prices exceeded fair market value by 39 to 72 percent, it is highly unlikely and beyond reasonable speculation that the value of the properties would appreciate to generate sufficient funds to repay the indebtedness and generate a profit. With nonrecourse financing "the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase." Estate of Franklin v. Commissioner,544 F.2d 1045, 1048 (9th Cir. 1976). In appendix A of his brief, petitioner attempts to show that the transactions were economically viable. He asserts that the out of pocket moneys paid by investors, increased at a "desired rate of return," would equal the future value of the properties after all payments were made. This future value was computed by applying "modest" inflation rates -- 3 to 7 percent -- to respondent's expert's valuation. Petitioner has presented a clever but superficial approach. A primary defect in his approach is that the rates of desired return were less than the *144 discount rate. The justification for this was that a reasonable investor would take into account tax benefits in computing return, thus using a lower rate would be justified. Even if we could accept this reasoning, which we cannot (see Herrick v. Commissioner,85 T.C. 237 (1985), holding that profit in the first instance means economic profit, independent of tax savings; Friendship Dairies, Inc. v. Commissioner,90 T.C. 1054 (1988), holding that tax credits cannot be taken into account in determining economic profit), petitioner has not laid an adequate foundation for reducing the discount rate to take into account tax benefits. It appears that the 2 or 3 percentage point reduction was arbitrary. In addition, we do not approve or sanction petitioner's computation of the future value of the buildings. Petitioner simply applied "modest" rates of inflation to respondent's computed values. It is clear that the underlying leases, not the general rate of inflation, would be the major determinant of value. For example, in the Duluth transaction, the rentals were fixed through the year 2040. Similarly, the First Valley Bank had options to renew through *145 the year 2038. Due to the fixed nature of the lease payments, external interest rates would have a significant effect on value. Finally, there are a number of other factors -- financial condition of the lessee, condition of the neighborhoods, condition of the buildings -- that would also have an effect on value. Other Factors
Future appreciation in value was the only possibility for investors to receive an economic return from these transactions. Given the fixed rental payments in the underlying leases, petitioner could only expect to benefit from appreciation at a time remote to the inception of the transactions. So long as interest rates remain constant, or increase, there will be no significant appreciation in the value of the properties until at or near the time they are freed from the constraints of the underlying leases.[29]
*146 For the properties subject to ground leases, the documents of purchase expressly stated that the improvements would revert to the Penners at the end of the ground lease term. Considering the critical importance of these reversion purchase options, it is suspicious that: (1) The only documentation for the Seaside option was a letter written 3 years after the date of purchase; (2) the documentation for the Progressive option is dated "November    , 1980;" and (3) there is no documentation for the Hacienda Bank option. Whether legal title passes has been one factor used by courts in determining whether a sale has occurred. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). However, the simple expedient of drawing up papers is not controlling for tax purposes, and we must look to the objective economic realities rather than the form the parties employ. Commissioner v. Tower,327 U.S. 280 (1946). In cases like this one, the relationship of price to fair market value and the character of the debt are more reflective of the economic realities than whether or not a deed is recorded. Although the documentation used in these transactions *147 was relatively thorough and complete, there were "telltale" signs of "tax shelter modus operandi." For example, the documentation for these transactions almost always bore execution dates in December and were made effective as of dates 6 months to 12 months earlier. If, as asserted, the deals were substantially closed as of these dates, it is curious that the documentation was still interlineated and rather informal in December. In correspondence to investors, petitioner referred to these undertakings as tax-oriented ventures. In informing investors that they had purchased a particular property, special mention was made as to the amount of loss per $ 15,000 investment. [30]
Therefore, from several perspectives used to analyze these transactions, we find that no sale occurred for income tax purposes; that there was no bona fide non-tax profit objective; and that no genuine indebtedness was created. Thus, petitioner is not entitled to the claimed "losses" from these partnerships. Estate of Franklin v. Commissioner, supra; Soriano v. Commissioner,90 T.C. 44 (1988); Cherin v. Commissioner,89 T.C. 986 (1987); *148 Rose v. Commissioner,88 T.C. 386 (1987); Zirker v. Commissioner,87 T.C. 970 (1986). [31]
Gross Income
The next issue is whether petitioner is required to recognize income upon the receipt of the partnership interests. Gross income includes compensation for services. Section 61. Thus, the receipt of a partnership interest in exchange for services generates taxable income. Diamond v. Commissioner,492 F.2d 286 (7th Cir. 1974), affg. 56 T.C. 530 (1971). While petitioner argues that he received only an interest in profits and losses, the partnership returns indicate that he had a percentage capital interest as well. Further, petitioner testified that he would share in any appreciation in value of partnership property, subject only to the right of the partners to first receive back their cash contributions. Thus, he did have an interest in partnership capital, in addition to profits and *149 losses. However, because the partnerships did not engage in "sales" for income tax purposes, they did not really acquire property. Partnership capital contributions were paid over to Penner as down payments or to others as administrative expenses. Thus, the interests received by petitioner in these partnerships were of no value or worthless (except for the potential of tax benefits), and no income was realized. Negligence
The next issue involves whether petitioner is liable for the section 6653(a) addition for negligence. Negligence, within the meaning of section 6653(a), is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioner argues that he had a good faith belief that the properties would appreciate in value, producing economic benefits, and that this was enhanced by substantial leverage and favorable seller financing. From our perspective the transactions were not reasonable. That does not, however, render petitioner's theory untenable. Although we rejected petitioner's favorable financing argument, it is not without some *150 support in the case law. See, e.g., Mayerson v. Commissioner,47 T.C. 340 (1966). Because the claimed losses were supported by a credible and unprecedented (albeit erroneous) theory, we decline to sustain the section 6653(a) additions to tax. Valuation Overstatement
The next issue is the addition to tax determined for valuation overstatements. Section 6659 provides for an addition to tax equal to 30 percent of the underpayment attributable to an overvaluation of more than 250 percent. Sec. 6659(a), (b). A valuation overstatement occurs if the adjusted basis of any property claimed on a return exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). The partnerships claimed an adjusted basis on the returns equal to the purchase prices. Since no sales are recognized for tax purposes, the correct adjusted bases are considered to be zero. See Zirker v. Commissioner, supra at 979. Thus, the underpayments attributable to the disallowed depreciation deductions would, absent section 6659(c)(2), be subject to a 30-percent addition for overvaluation. Prior to its repeal by the Tax Reform Act of 1984, section 6659(c)(2) *151 provided that section 6659 would not apply to any property which, at the close of the taxable year, was held by the taxpayer more than 5 years. The repeal is only effective for returns filed after December 31, 1984. Pub. L. 98-369, section 155(c), 98 Stat. 693. Although we have decided that petitioner was not entitled to the claimed losses from these partnerships because we found that no sale occurred for income tax purposes; that there was no bona fide non-tax profit objective; and that no genuine indebtedness was created, we have not found, in the ordinary sense, that the investors did not hold the property. Petitioner's claimed losses are, in large part, dependent upon the depreciation allowance of section 167. The allowance of depreciation under section 167 relates to "property used in the trade or business, or * * * property held for the production of income." (Emphasis supplied.) We have found that the property was not held for profit and that the transactions should not be given effect for tax purposes, but that is not to say that petitioner and other investors did not own or "hold" the real property in question. Section 6659(c)(2) was Congressionally *152 designed as an escape clause from the application of the section 6659 addition to tax. The provision is purposely phrased to permit "relief" from the addition to tax if the property was held more than five years. No modifiers, one way or the other, were included to limit the "escape clause" to a particular class of taxpayer. Although petitioner's "holding" of the properties has not been recognized for tax purposes, the properties have nevertheless been "held" by petitioner and the partnerships. To interpret these provisions based upon the method or type of underlying determination or disallowance is not justified considering the simple use of the term "held." Under the statutory provisions, the relief was available even though a taxpayer otherwise fell within the statutory provisions providing for an addition to tax for valuation overstatement. Thus, section 6659(c)(2) would apply for those partnerships or partners who held the property for more than five years and whose tax return was filed before December 31, 1984. Accordingly, with respect to properties acquired before December 31, 1977, (Hacienda, Bank of Florida, Duluth) section 6659 would only apply to 1981 taxable year. *153 Additional Interest - Section 6621
The final issue is the additional interest imposed on tax motivated transactions by section 6621(c). The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. 6621(c)(3)(A)(i). In addition, section 6621(c)(3)(A)(v) includes sham or fraudulent transactions within the scope of the additional interest section. Included in such transactions are those entered into without a profit motive and which were without economic substance. Patin v. Commissioner,88 T.C. 1086 (1987), affd. sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner,    F.2d     (9th Cir. 1989). See also sec. 301.6621-2T Q4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984); Cherin v. Commissioner, supra.Because the underpayments in this case were attributable to valuation overstatements, and transactions lacking in economic substance and profit objective, the additional interest applies. *154 To reflect the foregoing and concessions of the parties, Decisions will be entered under Rule 155.
Footnotes
1. These cases were consolidated for purpose of trial, briefing and opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiencies pursuant to section 6653(a)(2). ↩
3. The terms "sell," "sale," "purchase" and the like are used for convenience, and do not imply that a sale occurred for Federal income tax purposes.↩
4. When a post office was involved, petitioner generally attempted to negotiate a maintenance contract with Penner as part of the terms in order to place a ceiling on anticipated maintenance costs.↩
5. Hereinafter, unless otherwise noted, references to petitioner in the transactions also refer to the partnership for which he was purportedly acting.↩
6. The Senior Note was in the face amount of $ 2,670,000 and payable to the First Bank of Boston. The remaining balance at the time of purchase was $ 2,465,474.28.↩
7. Apparently, the $ 85,000 cash was part of and was to be applied to the $ 2,301,000 note, although this is not clear in the record.↩
8. Due to rounding error, the column only totals to 99.92 percent.↩
9. Apparently, Hacienda was later merged into and renamed Oxnard Properties Co. (Oxnard).↩
10. The mortgage was subsequently assigned to First Federal Savings and Loan of Wilmette.↩
11. There is no writing memorializing this amendment, however, apparently no payments were made in excess of the monthly rental amounts. ↩
12. This note was later purchased at a discount by petitioner.↩
13. Rent for the first and last partial calendar months is prorated.↩
14. The Penners were granted an option to require petitioner to purchase this note from them at a discount until Nov. 26, 1981.↩
15. They actually had purchased stock in two corporations for $ 800,000, one of which owned the hotel property sold. Apparently, approximately $ 660,000 was allocable to the property the partnership purchased.↩
16. Petitioner's theory assumes that the minimum rate acceptable for tax purposes under sec. 483 has some relevance as a starting point for interest rates. Possibly petitioner's premise is based on the consideration that a seller would have to report "implied interest" for tax purposes if he agreed to interest at an amount less that the minimum rate set in sec. 483. This consideration, however, has no apparent or logical connection to the amount of interest charged by an independent lender of capital. This would seem to be especially true where there is a large spread between the sec. 483 minimum rate and the prime rate (the rate banks charge to their most creditworthy borrowers).↩
17. There may be no tax difference where parties convert interest into principal by reducing the stated interest rate on an obligation. This is so because the principal would be depreciable over the life of the asset and interest on the note deductible over the term of the note. Although the so-called "passive loss" rules of the 1986 Tax Act may have some affect on the above-stated theorem, such rules were not effective for the years here in issue.↩
18. Hypothetically, below-market interest debt will generate slightly more rapid relative equity buildup (equity divided by original principal) than debt at the market rate.↩
19. The fact that the interest rate charged exceeded the test rate under section 483 did not affect our conclusion with regard to fair market value. Goldstein v. Commissioner,89 T.C. 535, 547↩ n. 15 (1987).
20. The reversions were valued using the same discount rates used to value the cash flows with the following variables: Property
Annual Renewal Rentals
Term
Duluth
$ 112,500
40 Years
Hacienda
165,000
30 Years
Seaside
300,000
30 Years
Bethlehem
900,000
38 Years
Progressive
277,000
30 Years
We think it is appropriate that the same discount rate be applied to both the income stream and the reversion. Even though making projections that far into the future is very speculative, as both experts pointed out the reversions are sufficiently far off into the future (21 to 29 years) that errors in the reversion values do not make that much of a difference. The reversions normally made up only about 15 percent of the value of a property.↩
21. The discount rates used are as follows: Duluth -- 8.25 percent; Hacienda -- 9.5 percent; Seaside -- 9.5 percent; Bethlehem -- 9.75 percent; Progressive -- 10.75 percent.↩
22. Petitioner's expert used a blended rate to take account of the fact that the rates were at market for the first 3 years.↩
23. For properties where respondent's expert did not originally include the reversion in petitioner's interest, (Hacienda, Seaside, Progressive) we added the value of the reversion as computed in the original expert report.↩
24. The purported option amounts to purchase the reversions were as follows: Hacienda, $ 243,000; Seaside, $ 375,000; Progressive, $ 530,000. This would increase the price to fair market value ratios to 190 percent, 188 percent, and 226 percent, respectively. ↩
25. This may have been due to the fact that the interest ran at market rates for the first 3 years. In an apparent attempt to maximize interest deductions, petitioner reduced the value of the properties "as financed." ↩
26. We have considered cases, where price was inflated 20 to 50 times over fair market value. See, for example, Soriano v. Commissioner,90 T.C. 44↩ (1988).
27. The negotiations were not at "arm's length" in the same sense as those between a "willing buyer and seller" necessary for the determination of fair market value. In this regard, perspective is affected by the fact that this was not a cash transaction. It was two separate transactions merged to produce a specialized result, which did not necessarily reflect the fair market value.↩
28. Agreeing upon a price, in the context of this case, was the equivalent of agreeing upon the amount of "up-front" cash to be received by Penner during the first few years of each transaction. The notes were paid by a conduit-like flow through of the lessee's payments to Penner or to the first lien holder, without profit or positive cash flow to petitioner's investors.↩
29. With respect to the Duluth Post Office, it is difficult to see how petitioner could benefit from any appreciation. The United States had an option to purchase the property at the end of the renewal terms for approximately $ 4.4 million dollars. The partnership paid $ 2.3 million dollars in 1977 for its one-half interest. If the property appreciated to any significant extent, the United States could exercise its option and the partnership would no longer own the property.↩
30. For the first 3 years, the cumulative loss to cash investment ratio was about 2:1.↩
31. If, at some future time, the properties appreciate so as to make payment of the purchase price reasonable, it is possible that a sale might occur at that time. We do not need to address that issue in this proceeding.↩