Karl A. BERGSTROM & Conny R. Bergstrom, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 94–45 T.

United States Court of Federal Claims.

Dec. 30, 1996.

Dana R. Taylor, Hagen, Dye & Hirschy, Portland, Oregon, for plaintiffs.

William K. Drew, Washington, D.C., for defendant, with whom was David Gustafson, Washington, D.C., of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge:

This case arises out of plaintiff's motion for partial summary judgment, filed April 26, 1996, and defendant's cross motion for partial summary judgment, filed May 21, 1996. The parties dispute whether nonrecourse purchase money debt that does not reasonably approximate fair market value of the related property is disregarded in its entirety for income tax purposes, or is disregarded only to the extent that such debt exceeds the fair market value of the property. The court holds that nonrecourse purchase money debt that does not reasonably approximate the fair market value of the property is disregarded in its entirety for income tax purposes.

### BACKGROUND & FACTS

Plaintiffs purchased interests in three limited partnerships: (1) Duluth Properties Company ("Duluth"); (2) Tucson Properties Company ("Tucson"); and (3) Bethlehem Properties Company ("Bethlehem"). Plaintiffs were limited partners who purchased a 12.88% interest in Duluth in 1977 for $60,000, a 3.393% interest in Tucson in 1978 for $22,500, and a 2.5987% interest in Bethlehem in 1979 for $75,000. Plaintiffs' claims involve notices of deficiencies issued by the Commis-

sioner of the Internal Revenue Service to plaintiffs for their share of the partnerships' losses during the years 1977 through 1981. The claimed losses total $408,095:

### Table 1: Plaintiffs' Claimed Losses Per Partnership Per Year

| Taxable Year | Duluth ($) | Tucson ($) | Bethlehem ($) | Total ($) |
|---|---|---|---|---|
| 1977 | 36,089 | NA | NA | 36,089 |
| 1978 | 45,020 | 16,616 | NA | 61,636 |
| 1979 | 40,604 | 18,663 | 61,124 | 120,391 |
| 1980 | 30,233 | 17,900 | 55,777 | 103,910 |
| 1981 | 23,979 | 12,479 | 49,611 | 86,069 |
| TOTALS | 175,925 | 65,658 | 166,512 | 408,095 |

Plaintiffs' federal income tax returns for the years in question reported the following federal income tax liabilities:

### Table 2: Plaintiffs' Tax Liability 1977–1981

| Taxable Year | Tax Liability Per Return ($) |
|---|---|
| 1977 | 95 |
| 1978 | 218 |
| 1979 | 0 |
| 1980 | 0 |
| 1981 | 2,588 |

Sol Finkelman, the general partner of each partnership, filed a petition with the U.S. Tax Court regarding the tax treatment of his interests only. The tax court held that the partnerships' property acquisitions should be entirely disregarded in relation to computing Mr. Finkelman's tax liability. *Finkelman v. Commissioner*, 56 T.C.M. (CCH) 1269, 1989 WL 11480 (1989), *aff'd*, 937 F.2d 612 (9th Cir.1991), *cert. denied*, 503 U.S. 918, 112 S.Ct. 1291, 117 L.Ed.2d 515 (1992). Relying on authorities not cited in *Finkelman*, plaintiffs filed suit in this court to establish their tax liability for a purchase of property secured by nonrecourse debt, where the purchase price exceeded fair market value.

Duluth acquired interests in two post office properties—one in Duluth, Minnesota and the other in Verona, Pennsylvania. Duluth purchased a one-half interest in the Duluth post office as of April 1, 1977 for a stated purchase price of $2,301,000. This was payable with a $260,000 cash down payment with the balance to be paid over a twenty-seven-year period at interest rates between 5% and 10%. At that time, the fair market value of a one-half interest in the Duluth post office was $1,338,855. The rental income and expenses from the property yielded net losses as outlined in Table 3 below.

### Table 3: Duluth Post Office—Rental Income, Expenses & Net Loss

| Item | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|---|---|
| Rental Income | 81900 | 109200 | 109200 | 109200 | 109200 | 109200 |
| Expenses: | | | | | | |
| —Depr. | −101665 | −135553 | −135553 | −135553 | −135553 | −131438 |
| —Interest | −175718 | −223452 | −230913 | −150271 | −121374 | −122119 |
| —Maint. | −1800 | −2400 | −2400 | −2400 | −2400 | −2400 |
| —Other | −62000 | −33500 | | | | |
| Net Loss | −259683 | −285705 | −259666 | −179024 | −150127 | −146757 |

By December 1, 1977, Duluth had also acquired the Verona post office buildings for a stated purchase price of $453,400, payable with a $62,000 cash down payment, and the balance to be paid over a thirteen-year period with interest accruing at varying rates between 5% and 10%. At that time, the fair market value of the Verona post office was $232,000. The rental income and expenses from the property yielded net losses as outlined in Table 4 below.

### Table 4: Verona Post Office—Rental Income, Expenses & Net Loss

| Item | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|
| Rental Income | 2183 | 26200 | 26200 | 26200 | 26200 |
| Expenses: | | | | | |
| —Depr. | −3043 | −36515 | −36515 | −36515 | −36515 |
| —Interest | −3778 | −41266 | −42016 | −42138 | −22480 |
| —Maint. | −220 | −2649 | −2649 | −2649 | −2649 |
| —Ground Rent | −50 | −600 | −600 | −600 | −600 |
| Net Loss | −20508 [1] | −63830 | −55580 | −55702 | −36044 |

By December 26, 1978, Tucson acquired an interest in an office building located in Tucson, Arizona for a stated purchase price of $4,237,500, payable with a $535,000 cash down payment, and the balance to be paid over a twenty-five-year period with interest accruing at varying rates between 5% and 10%. The fair market value of the Tucson office building at that time was between $1,977,000 and $2,357,000. The rental income and expenses from the property yielded a net loss as outlined in Table 5 below.

### Table 5: Tucson Properties—Rental Income, Expenses & Net Loss

| Item | 1978 | 1979 | 1980 |
|---|---|---|---|
| Rental Income | 153833 | 213000 | 213000 |
| Expenses: | | | |
| —Depreciation | −226335 | −313387 | −297176 |
| —Interest | −365925 | −424869 | −437071 |
| —Legal & Acctg | −30000 | −11000 | |
| —Amortized Org. Expense | −6300 | −6300 | −6300 |
| —Admin. | −15000 | −7500 | |
| Net Loss | −489727 | −550056 | −527547 |

On October 12, 1979, Bethlehem, through its general partner Sol Finkelman, acquired an interest in an office building located in Bethlehem, Pennsylvania for a stated purchase price of $12.5 million, payable with a $2,435,000 cash down payment during the first year-and-a-half and the balance to be paid over a twenty-two-year period with interest accruing at varying rates between 6.5% and 11%. The fair market value of the Bethlehem office building was $8,300,000. The rental income and expenses from the property yielded net losses as outlined in Table 6 below.

1. The figures provided in the tables are taken from the parties' stipulation of facts filed April 15, 1996.

Table 6: First Valley Bank Building—Rental Income, Expenses & Net Loss

| Item | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| Rental Income | 830000 | 830000 | 830000 | 830000 |
| Expenses: | | | | |
| —Depreciation | − 1455073 | − 1455073 | − 1455073 | − 1070129 |
| —Interest | − 1461049 | − 1395954 | − 1294922 | − 779345 |
| —Admin. | − 79000 | − 39750 | | |
| —Org. Exp. | − 28500 | − 28500 | − 28500 | − 28500 |
| —Legal & Acctg. | − 158500 | − 79000 | | |
| Net Loss | − 2352122 | − 2168277 | − 1948495 | − 1047974 |

Each of the partnerships reported purchases according to the above terms with consistent depreciation and interest deductions, which were passed through to plaintiffs.

The partnerships were promoted by Sol Finkelman, who described their transactions as "tax oriented ventures." The transactions generally involved real estate deals with Joseph Penner, a real estate developer. Finkelman and Penner usually followed an established course of conduct. Beginning in 1970, the Penner–Ring Company, and thereafter Penner individually, sold real estate to partnerships formed by Finkelman.[2] After 1975, the involved properties were post offices or commercial buildings under long-term leases or master leases.

The negotiation process typically began when Penner furnished information to Finkelman concerning the land, improvements, tenants, applicable lease terms including rentals, underlying indebtedness, and Penner's desired sale terms. The terms included the amount of the cash down payment, the amount of any balloon payment, and the length of the payout period. Negotiations typically focused on price, interest rate, seller financing, down payment, financing period, and the amount of the balloon payment.

Some transactions were purchases of improvements with an execution of a ground lease, rather than purchases of property in fee simple. In those transactions, the improvements would revert to Penner at the end of the ground lease. Penner typically

asked for a price based on an all cash deal; then Finkelman would submit a "below market financing proposal" to Penner with an increased purchase price.

In the typical real estate transaction between Penner and Finkelman, the taxpayer/purchaser would pay the down payment over a period of two or three calendar years. After the taxpayer completely paid the down payment, the cash flow from rental payments would be paid by the tenant to either an independent corporate trustee or to Penner directly. Each rental payment was credited to the unpaid interest and principal on the promissory notes, as well as to any ground rents due Penner on properties where the partnership had only a ground lease. Ten to fifteen years after the purchase agreement was executed, a substantial balloon payment, equal to two to four times the original down payment would be due to Penner. The balance remaining after the balloon payments usually was due at or about the time the initial term of the underlying lease ended.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of mate-

---

2. The terms "sell," "sale," "purchase" and the like are used herein for convenience, and do not imply that a sale occurred for income tax purposes.

rial fact exists must be resolved in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court does not "weigh the evidence and determine the truth of the matter but [only] determine[s] whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. Not until the moving party has met its burden of showing entitlement to judgment as a matter of law does the burden shift to the non-moving party to provide facts establishing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Neither party may discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975).

When the parties have filed cross motions for summary judgment, as in the instant case, the court must evaluate each motion on its own merits. The fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of material fact for trial does not relieve the court of its duty to decide whether summary judgment is appropriate. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed. Cir.1987)). Cross motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other must necessarily be allowed. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). The court must "draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors*, 812 F.2d at 1391.

Plaintiffs ask the court to grant partial summary judgment on the ground that non-recourse purchase money debt that does not reasonably approximate fair market value of the property is, for income tax purposes, disregarded only to the extent that such debt exceeds the fair market value of the property. In its cross motion, defendant conversely asserts that such purchase money debt be disregarded in its entirety for income tax purposes.

A comprehensive analysis of the parties' memoranda, stipulations of fact, and stipulated exhibits leads the court to conclude that (1) nonrecourse purchase money debt that does not reasonably approximate the fair market value of the property should be disregarded in its entirety; and (2) there are no genuine issues of material fact.

## II. Nonrecourse Obligations & Federal Taxation

### A. Statutory Background

The Internal Revenue Code ("the Code") does not contain any specific provision for the tax treatment of nonrecourse indebtedness that exceeds a property's fair market value. Although case law partially fills the void left by the Code's inadequate treatment of nonrecourse debt, the instant issue remains unresolved. However, before explaining the unresolved issue presented by the cross motions for partial summary judgment, it is necessary to explain the statutory framework that the Code creates.

The Code provides for a depreciation deduction that is defined generally as a "reasonable allowance for the exhaustion, wear and tear ... (1) of property used in the trade or business, or (2) of property held for the production of income." I.R.C. § 167(a). To determine the amount of the depreciation deduction, the Code requires the calculation of an adjusted basis. I.R.C. §§ 167(c)(1), 1011(a). A property's basis is generally defined as "the cost of such property." I.R.C. § 1012.

Purchase money debt is generally included in the "cost" of property, and thus is regarded as part of the property's basis. *Crane v. Commissioner*, 331 U.S. 1, 9–10, 67 S.Ct. 1047, 1052–53, 91 L.Ed. 1301 (1947). However, when the debt is nonrecourse in nature,

and exceeds a reasonable estimate of fair market value, the majority rule is that the entire debt is disregarded from basis. *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048–49 (9th Cir.1976); *see also Hildebrand v. Commissioner*, 967 F.2d 350, 352–53 (9th Cir.1992), *aff'g Lukens v. Commissioner*, 945 F.2d 92, 97–99 (5th Cir.1991); *Lebowitz v. Commissioner*, 917 F.2d 1314, 1318–19 (2d Cir.1990); *Durkin v. Commissioner*, 872 F.2d 1271, 1277–78 (7th Cir.), *cert. denied*, 493 U.S. 824, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989); *Estate of Isaacson v. Commissioner*, 860 F.2d 55, 56 (2d Cir.1988); *Estate of Baron v. Commissioner*, 798 F.2d 65, 68–69 (2d Cir.1986); *Odend'hal v. Commissioner*, 748 F.2d 908, 913 (4th Cir.1984), *cert. denied*, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); *Brannen v. Commissioner*, 722 F.2d 695 (11th Cir.1984).

The Code also provides that "all interest paid or accrued within the taxable year on indebtedness" will be allowed as a deduction. I.R.C. § 163(a). Interest deductions generally are allowed, even when the purchase money debt does not subject the taxpayer to personal liability. *Estate of Franklin*, 544 F.2d at 1049 (citing *Manuel D. Mayerson v. Commissioner*, 47 T.C. 340, 352, 1966 WL 1129 (1966)). However, the *Franklin* court pointed out that if nonrecourse liability exceeds a reasonable estimate of fair market value, then the absence of personal liability may "reduce the transaction in economic terms to a mere chance that a genuine debt obligation may arise." *Id.* at 1049. The consequence of this absence of genuine indebtedness is the disallowance of the interest deduction.

The relevant jurisprudence on the tax treatment of nonrecourse purchase money indebtedness in excess of fair market value merges the analysis of depreciation and interest deductions such that "when nonrecourse debt is excluded from the basis for purposes of calculation of depreciation, it is not treated as genuine indebtedness for determination of interest deductions." *Pleasant Summit Land Corp. v. Commissioner*, 863 F.2d 263, 274 (3d Cir.1988), *cert. denied*, 493 U.S. 901, 110 S.Ct. 260, 107 L.Ed.2d 210

(1989). Our discussion of the issues below follows suit.

B. Whether Nonrecourse Debt Should Be Recognized in Basis to the Extent of Fair Market Value, or Disregarded in its Entirety

1. The Basic Rule: *Estate of Franklin*

The issue of whether nonrecourse purchase money indebtedness is included in a property's basis has been addressed by various appellate courts. The Ninth Circuit expressed the basic rule in *Estate of Franklin*, 544 F.2d at 1045. Where "purchase price exceeds a demonstrably reasonable estimate of the fair market value," the transaction does not possess economic substance, and therefore is not a sale for income tax purposes. *Id.* at 1048. The Ninth Circuit reasoned that:

> Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase.

*Id.* The court's finding that such transactions lack economic substance ultimately led to the disallowance of both depreciation and interest deductions.

The *Franklin* court found that depreciation " 'is not predicated upon ownership of property *but rather upon an investment in property.*' " *Id.* at 1049 (citing *Gladding Dry Goods Co.*, 2 B.T.A. 336 (1925)). Further, the court found that in the absence of equity in property, an investment cannot exist. Thus, because payments on a loan principal yield no equity when the unpaid balance exceeds fair market value, there can be no investment in the property and, consequently, no depreciation deduction.

The Ninth Circuit asserted that interest deductions can exist only where the "purchase money debt secured by the mortgage on the acquired property does not deprive the debt of its character as a *bona fide debt obligation.*" *Id.* (citing *Manuel D. Mayerson*, 47 T.C. 340, 352 (1966)) (emphasis add-

ed). A bona fide debt obligation does not arise when a debt's economic significance is contingent upon the property's substantial appreciation in value before the date of the balloon payment. Ultimately, "[f]or debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price." *Id.*

However, the *Franklin* court did carve out an exception to its holding. The court cautioned that its opinion "should not be read as premised upon the belief that a sale is not a sale if the purchaser pays too much." *Id.* The exception assures taxpayers that transactions which *reasonably* approximate fair market value will not be treated as lacking in economic substance. A taxpayer who innocently falls subject to a bad bargain still engages in a sale transaction for tax purposes. *See id.*

### 2. Decisions Subsequent to *Estate of Franklin*

Subsequent to the Ninth Circuit's holding in *Estate of Franklin,* most circuit courts dealing with the tax treatment of nonrecourse liability in excess of fair market value have followed *Estate of Franklin.* These courts have held that the entire nonrecourse debt should be disregarded from the basis calculation when the nonrecourse purchase money debt exceeds fair market value. However, the Third Circuit adopted a different approach in *Pleasant Summit Land Corp. v. Commissioner,* 863 F.2d 263 (3d Cir.1988). In *Pleasant Summit,* the Third Circuit found that nonrecourse purchase money indebtedness in excess of fair market value should be recognized for tax purposes to the extent of fair market value. *Id.* at 276–77.

The Third Circuit relied on ambiguous language found in the Fourth Circuit's opinion in *Odend'hal v. Commissioner,* 748 F.2d 908 (4th Cir.1984), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985). In *Odend'hal,* the court stated that "[i]f, as a

matter of fact, the fair market value of the property is less than that financed by a nonrecourse loan, the authorities hold that the principal of the nonrecourse loan *which exceeds fair market value* does not represent a real investment in the property by a taxpayer and he may not include that nonrecourse amount in his basis for depreciation." *Id.* at 912 (citing *Brannen,* 722 F.2d at 695) (emphasis added).[3] The Fourth Circuit ultimately held that the entire nonrecourse loan principal should be disregarded from basis for the purposes of calculating depreciation and interest deductions. *Id.* at 913.

The Third Circuit in *Pleasant Summit* misread the Fourth Circuit holding and relied on *Odend'hal* for the proposition that the debt be recognized in basis up to fair market value. *Pleasant Summit,* 863 F.2d at 276–77. The court reasoned that:

> While we regard *Odend'hal* and *Estate of Franklin* as the appropriate precedents, we do not consider them as authority to eliminate all deductions for interest and depreciation. While we realize that a taxpayer holding property subject to a nonrecourse debt in excess of the market value of the property may have no incentive to pay off any portion of the debt, including the amount not exceeding the fair market value of the property, it is equally logical to recognize that the creditor holding the debt has no incentive to take back the property if the taxpayer offers to pay the debt up to the value of the property.... Thus it is appropriate to disregard only the portion of nonrecourse debt in excess of the fair market value of the property when it was acquired for purposes of calculations of the depreciation and interest deductions and to regard nonrecourse debt as genuine indebtedness to the extent it is not disregarded. Moreover, there is precedent for disallowing deductions based on nonrecourse debt only insofar as attributable to the excess of debt over the fair market value.

*Id.* at 276–77 (citing *Odend'hal,* 748 F.2d at 912–14). This is a Third Circuit misinterpre-

---

**3.** The Fourth Circuit further asserted that "if the stated price financed by nonrecourse debt exceeds the fair market value of the property, to the extent of the excess, the taxpayer has no equity in the property to protect and no economic incentive to pay off the debt." 748 F.2d at 912.

tation of *Odend'hal.* As stated above, the Fourth Circuit followed the course set by *Franklin* by disregarding the entire debt for depreciation and interest deduction purposes.

The Third Circuit also argued that the taxpayer's economic incentive to pay the debt is as relevant as the creditor's incentive to accept payment on it. This court disagrees. Although the Third Circuit purportedly relied on *Estate of Franklin* in arriving at its conclusion to disregard only part of the non-recourse debt, the *Franklin* court in fact used a line of reasoning diametrically opposed to that employed in *Pleasant Summit.* The Ninth Circuit based its holding on the absence of economic substance where nonrecourse purchase money indebtedness exceeds a reasonable estimate of the property's fair market value. *Estate of Franklin,* 544 F.2d at 1048–49. Where such economic substance is lacking, the debt incurred in the transaction cannot be recognized, either in whole or in part, for the purposes of depreciation and interest deductions. To hold that nonrecourse debt should be recognized up to fair market value implies that economic substance does indeed exist. Furthermore, the Third Circuit's argument that the transaction would be substantive from the creditor's perspective is fallacious because it is the taxpayer's perspective that is relevant—the key issue is whether the taxpayer made an investment and incurred a genuine indebtedness, not whether the seller would accept a portion of the debt as payment for the whole. *See Pleasant Summit,* 863 F.2d at 276. The opinions of the creditor play no part in determining tax liability.

Numerous other courts have criticized the Third Circuit's recognition of nonrecourse debt in basis. For example, in *Lebowitz v. Commissioner,* 917 F.2d 1314 (2d Cir.1990), the Second Circuit held that:

> If the obligation of the [nonrecourse] note unreasonably exceeds the value of the underlying security, the transaction lacks economic substance. We fail to see how a taxpayer can have an incentive to pay a portion of a nonrecourse debt equal to the value of the security when an unreasonably large portion of that debt would continue to lack supporting value. To the extent

that *Pleasant Summit Land Corp. v. Commissioner* holds otherwise, therefore, we respectfully disagree.

*Id.* at 1318–19 (citation omitted). The Second Circuit denounced the *Pleasant Summit* holding as wholly inconsistent with the well-established case law flowing from *Estate of Franklin.* Despite assertions to the contrary, the concept of partial recognition of nonrecourse indebtedness up to fair market value in basis cannot be reconciled with *Estate of Franklin.*

Other appellate courts similarly have found *Pleasant Summit's* holdings inconsistent, and incorrect, in light of *Estate of Franklin.* The Fifth Circuit in *Lukens v. Commissioner,* 945 F.2d 92 (5th Cir.1991), was in accord with *Lebowitz,* stating that:

> We therefore reject Lukens' invitation to embark on the course set by *Pleasant Summit,* and prefer instead to embrace the position of the Ninth Circuit in *Estate of Franklin,* which has been accepted by the Second and Fourth Circuits. The proper inquiry in this situation, as recognized in *Estate of Franklin,* is not whether the seller/creditor has an incentive to settle the debt at the fair market value of the collateral, but whether it would be reasonable for the buyer/debtor to make a capital investment in the unpaid purchase price. *Accord Lebowitz,* 917 F.2d at 1319.

*Id.* at 98–99. Also noteworthy is the opinion of the Ninth Circuit, which stated that "[t]he taxpayers invite us to follow *Pleasant Summit Land Corp. v. Commissioner.* We decline the invitation for the reasons stated by the Fifth Circuit. *See Lukens.*" *Hildebrand v. Commissioner,* 967 F.2d 350, 353 (9th Cir. 1992). In its laconic statement, the Ninth Circuit confirmed that its own holding in *Estate of Franklin* cannot be reconciled with the Third Circuit's inclusion of nonrecourse debt in basis to the extent of fair market value.

### 3. The Tax Reform Act of 1986

Plaintiffs further argue that the Tax Reform Act of 1986 ended "much of the public tax shelter activity that had taken place over the previous 15 or 20 years," and that the Act is inconsistent with the holdings of *Es-*

tate of *Franklin*. Pls. Reply Br. in Support of Mot. for Partial Summ.J. & in Resp. to Def.'s Cross-mot. for Summ.J. at 14. The enactment of the Tax Reform Act is wholly irrelevant. The events at issue in the present case occurred during the taxable years from 1977 to 1981, long before the Tax Reform Act went into effect.[4] Moreover, Congress's actions arguably reinforce the importance of the widespread decision to disallow depreciation and interest deductions derived from the very kind of tax shelters that Congress sought to eliminate.

### C. Plaintiffs' Nonrecourse Obligations Are to Be Disregarded in Their Entirety Because They Exceed a Reasonable Approximation of Fair Market Value

 This court holds that when nonrecourse purchase money debt exceeds a reasonable approximation of the property's fair market value, the debt is disregarded in its entirety for the purposes of determining depreciation and interest deductions. Thus, the issue is whether plaintiffs' nonrecourse obligation exceeded a reasonable approximation of fair market value. Plaintiffs contend that "neither the government nor the authorities it cites define what constitutes unreasonably excessive debt." *Pls. Reply Br. in Support of Mot. for Partial Summ.J. & in Resp. to Def.'s Cross-mot. for Summ.J.* at 15. It is true that the determination of whether the debt constitutes a reasonable approxima-

tion of fair market value is fact-based. However, plaintiffs imply that the factual nature of the determination should render a judgment on reasonableness impossible. The court must disagree. Previous courts have found nonrecourse debt in excess of a reasonable approximation of fair market value where the excess was as low as 39%. In *Finkelman*, the tax court confronted this issue in its analysis of some of the Penner transactions. The transaction prices exceeded fair market value universally, but the percent of purchase price in excess of fair market value varied between 39% and 72%. *Finkelman*, 56 T.C.M. (CCH) at 1285. Despite this broad range, the court found that "[w]hile the price to fair market value ratios in this case are not inherently egregious, the difference in absolute terms amounts to hundreds of thousands of dollars." *Id.* (footnote omitted).

In the present case, the parties have stipulated to facts that show the partnerships' purchase prices exceeded fair market value by even greater margins than those in *Finkelman*. See Table 7 below. As with the *Finkelman* transactions, the difference between price and fair market value in absolute dollar figures is of a magnitude that cannot be termed reasonable. In aggregate, the high price to fair market value ratios, and the absolute difference between price and fair market value manifest the unreasonableness of the debt's approximation of fair market value.

#### Table 7: Percent of Purchase Price in Excess of Fair Market Value

| Property At Issue | Purchase Price [5] (Value of Nonrecourse Note Principal) | Fair Market Value | Percent of Purchase Price in Excess of Fair Market Value |
|---|---|---|---|
| Duluth Post Office (Duluth Partnership) | $ 2,301,000 | $1,338,855 | 71.9% |
| Verona Post Office (Duluth Partnership) | $ 453,400 | $ 232,000 | 95.0% |
| Union Bank Building (Tucson Partnership) | $ 4,237,500 | $2,357,000 | 79.8% |
| First Valley Bank Building (Bethlehem Partnership) | $12,500,000 | $8,300,000 | 50.6% |

4. The passive loss rules of the Tax Reform Act of 1986 are effective only for the taxable years beginning after December 31, 1986. Tax Reform Act of 1986, Pub.L. No. 99–514, 1986 U.S.C.C.A.N. (100 Stat.) 4226.

5. Where the exact figures for purchase price and fair market value fall within a range, the court has chosen the figures that yield the smallest percentage of purchase price in excess of fair market value.

Plaintiffs urge the court to consider "such factors such as the interest rates and payment terms on the nonrecourse debt, risk of loss and other relevant factors." Pls. Reply Br. in Support of Mot. for Partial Summ.J. & in Resp. to Def.'s Cross Mot. for Summ.J. at 13. Plaintiffs argue that the consideration of these factors will show that "the fair market value of the Partnerships' acquisition cost approximately equals the fair market value of the property received." *Id.* at 13. They further argue that interest rates and other financing arrangements may create a situation in which the partnerships' nonrecourse debt notes reasonably approximate fair market value. This argument is without merit. Neither purchase price, nor nonrecourse obligation principal becomes more easily approximated to fair market value by virtue of favorable financing arrangements. *See Finkelman,* 56 T.C.M. (CCH) at 1284–85. The relevant comparison is simply between the debt principal and fair market value of the property at issue.

In addition, plaintiffs assert that the facts of the present case are analogous to the unique circumstances considered in *Regents Park Partners v. Commissioner,* 63 T.C.M. (CCH) 3131, 1992 WL 126067 (1992). This argument is also without merit. In *Regents Park,* the tax court found it unnecessary to resolve the issue of the extent to which nonrecourse debt in excess of fair market value should be included in basis. Rather, the tax court reasoned that:

> Since the rule of *Estate of Franklin* in predicated upon a determination that only in the case where the buyer has an equity in the property would it have any incentive to pay off the nonrecourse indebtedness, and since in this case the total amount of the debt and accrued interest exceeds the property's fair market value, the partnership would also lack the requisite equity interest. However, we believe that this result is inappropriate.... We conclude that *given the structure of the indebtedness as modified by the PWA* [provisional workout agreement], the partnership had a

legitimate economic interest to continue to make payments on the debt, and that it was unlikely to abandon or walk away from the transaction.... Thus, we hold that *under the particular circumstances of this case,* which involves, inter alia, the acquisition of property subject to nonrecourse indebtedness that exceeds its fair market value, the partnership is entitled to a basis in the amount of the property's fair market value; and the indebtedness, to the extent that it exceeds fair market value, is treated as a contingent liability, and not as an addition to basis.

*Id.* at 3131–17 (citations omitted) (emphasis added). Given the complex facts of *Regents Park,* the tax court found that the provisional workout agreement created an equity interest in the property beyond the cash investment initially made by the taxpayers. As a result, the taxpayers possessed an economic incentive to complete payment of the nonrecourse debt. Although the tax court purportedly denied resolving the inconsistency between *Estate of Franklin* and *Pleasant Summit,* the court ultimately supported the holding of *Pleasant Summit* by permitting recognition of nonrecourse debt to the extent of fair market value.

Even if this court agreed with the reasoning in *Regents Park,* the facts surrounding the instant case do not give rise to an equity interest above and beyond the cash investments made by plaintiffs. The facts and circumstances in *Regents Park* included the taxpayer's "preacquisition interest in the property, the District Court's refusal to allow HUD to proceed with foreclosure, the relatively low interest rates on the notes at a time when the interest rate for Treasury bonds exceeded 10 percent, and the willingness of HUD to restructure the notes in 5 years based upon the income of the property at that time, making it unlikely that HUD would foreclose on the property following the expiration of the PWA." *Id.* The unique circumstances surrounding *Regents Park* make application of its holding to other cases almost impossible. The factors that plaintiffs assert they will prove merely in-

volve the details of a basic financing arrangement. In contrast, *Regents Park* involved a preacquisition interest, a provisional workout agreement, and extensive involvement by the Department of Housing and Urban Development in the transaction. *Id.* No such extraordinary circumstances exist in the present case to give rise to an equity interest.

■ Finally, the *Estate of Franklin* bad bargain exception does not apply in the present case. Plaintiffs' case possesses no evidence of the partnerships' procurement of a bad deal. Rather, the partnerships' general partner, Sol Finkelman, referred to the partnerships' ventures as being "tax oriented," and the transactions were designed to yield significant tax benefits. Additionally, the partnerships' ventures bear striking similarities to the transactions in *Estate of Franklin* and those of the other tax shelter cases cited above. The Penner transactions involved purchases of real estate using nonrecourse notes that unreasonably exceeded the properties' fair market value. The nonrecourse notes were long-term, with substantial balloon payments due in the future. The transactions generated losses for several years prior to the balloon payment, but yielded substantial tax savings for investors, plaintiffs among them. Consequently, the Penner transactions were devoid of economic substance, and the partnerships' nonrecourse obligations should be entirely disregarded from basis for the purposes of determining depreciation and interest deductions.

## CONCLUSION

The court holds that nonrecourse purchase money debt that does not reasonably approximate the fair market value of the property is disregarded in its entirety for income tax purposes. Given the absence of any genuine issues of material fact, the court orders that plaintiffs' motion for partial summary judgment is denied, and that defendant's cross motion for partial summary judgment is allowed.

**IT IS SO ORDERED.**